IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DENNIS A. PSOTA,

                Plaintiff,

    v.

NEW HANOVER TOWNSHIP, et al.,

                Defendants.

CIVIL ACTION
NO. 20-5004

## OPINION

**Slomsky, J.**                                                              **December 29, 2021**

TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................................................................1

II.  BACKGROUND ..................................................................................................................2

    **A. Plaintiff's Employment with New Hanover Township Police Department**...............2

        1. Plaintiff's Report of Time Theft and Ensuing Harassment......................................2

        2. First <u>Loudermill</u> Notice and Traffic Assignment......................................................3

        3. <u>Weingarten</u> Hearing, Second <u>Loudermill</u> Notice, and <u>Loudermill</u> Hearing .............5

    **B. Plaintiff's Resignation and the 2019 Election**

      **for Magisterial District Judge** ........................................................................................6

    **C. Post-Resignation <u>Brady</u> Referral** .................................................................................7

    **D. This Litigation and Defendants' Motion to Dismiss**

      **the Amended Complaint** ..................................................................................................9

III. STANDARD OF REVIEW ................................................................................................12

IV.  ANALYSIS ........................................................................................................................15

    **A. Plaintiff's Claims Against the Township** .....................................................................15

        1. Section 1983 Claims Against the Township: <u>Monell</u> Liability...............................15

i

a. <u>Monell</u> Liability: Violations of Plaintiff's Constitutional Rights ................16

    i.  Fourteenth Amendment Liberty Interest in Employment .................16

    ii. Fourteenth Amendment Liberty Interest in Reputation:

        Stigma Plus ........................................................................24

    iii. First Amendment Retaliation Claim ...................................28

b. <u>Monell</u>: Second Prong Regarding Retaliation Claim ....................34

    i.  Township Policy, Custom, or Deliberate Indifference .......34

    ii. Delegation and Ratification .................................................37

2. Plaintiff's State Law Claims Against the Township ......................43

  a. Immunity Under the Political Subdivision Tort Claims Act ........44

  b. Pennsylvania Whistleblower Law ..............................................45

  c. Violation of Pennsylvania Constitution ......................................48

**B. Plaintiff's Claims Against Individual Defendants** .......................................**49**

1. Section 1983 Claims Against Individual Defendants:

Qualified Immunity ........................................................................49

  a. Qualified Immunity: Violations of Plaintiff's Constitutional Rights ...........49

  b. Qualified Immunity: Whether Right Was Clearly Established ...................51

2. State Law Claims Against Individual Defendants ...................................55

  a. Immunity Under the Political Subdivision Tort Claims Act ........55

  b. Pennsylvania Whistleblower Law ..............................................56

  c. Defamation ................................................................................56

  d. False Light Defamation ..............................................................62

**C. Punitive Damages** ........................................................................................**63**

**V.  CONCLUSION** .......................................................................................**65**

## I.     INTRODUCTION

On September 21, 2020, Plaintiff Dennis Psota, a former police officer with the New Hanover Township Police Department, initiated this case in the Court of Common Pleas of Montgomery County against New Hanover Township (the "Township"), the New Hanover Township Police Department (the "Department"), Department Police Chief Kevin McKeon ("Chief McKeon"), Township Manager Jamie Gwynn ("Manager Gwynn"), and Magisterial District Justice Maurice H. Saylor ("Justice Saylor"). [1]  (See Doc. No. 1 ¶ 1.)  On October 9, 2020, the case was removed to this Court based on federal question jurisdiction, (see id. at 1), and on October 16, 2020, Defendants filed a Motion to Dismiss the Complaint (Doc. No. 6).

In turn, Plaintiff filed an Amended Complaint.  (Doc. No. 10.)  This filing led to the first Motion to Dismiss being denied without prejudice as moot.  (See Doc. No. 11.)  In the Amended Complaint, Plaintiff asserts claims in seventeen counts which arise under 42 U.S.C. § 1983 ("Section 1983") and Pennsylvania state law.  (See id. ¶¶ 135–317.)  The Amended Complaint did not name the Township Police Department as a defendant.  On July 8, 2021, the Court dismissed the Department from this case.  (See Doc. No. 19.)  The remaining Defendants are the Township, Chief McKeon, and Township Manager Gwynn (collectively, "Defendants"; McKeon and Gwynn together are referred to as the "Individual Defendants").

Before the Court is Defendants' Motion to Dismiss the Amended Complaint ("Motion to Dismiss," or "Motion") in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.  (Doc. No. 12.)  On December 10, 2020, Plaintiff filed a Response in Opposition to the Motion (Doc. No. 14) ("Response"), and on

---

[1]     The parties entered into a stipulation dismissing Justice Saylor as a defendant.  (See Doc. No. 7.)

December 16, 2020, Defendants filed a Reply (Doc. No. 15) ("Reply").  On June 24, 2021, the Court held a hearing on the Motion.  (See Doc. No. 17.)

The Motion is now ripe for disposition.  For reasons stated infra, Defendants' Motion to Dismiss (Doc. No. 12) will be granted in part and denied in part.[2]

## II.     BACKGROUND[3]

### A.     Plaintiff's Employment with New Hanover Township Police Department

#### 1.     Plaintiff's Report of Time Theft and Ensuing Harassment

Plaintiff Dennis Psota is a former police officer employed by the New Hanover Township Police Department.  (See Doc. No. 10 ¶ 1.)  Throughout his 23-year law enforcement career, Plaintiff "ha[s] never been accused of providing testimony . . . that was not credible" in any case—criminal or civil.  (Id. ¶ 50.)

Under Pennsylvania law, New Hanover Township is "governed and supervised by"[4] a Board of Supervisors ("the Board"), "which is comprised of five members . . . ."  Board of Supervisors, NEW HANOVER TOWNSHIP, PA, https://www.newhanover-pa.org/departments/administration.php.[5]  The Board is vested with the authority to, inter alia, "organiz[e] and supervis[e]" a police department for the Township and to "determine the number

---

[2]  In reaching a decision, the Court has considered the Amended Complaint (Doc. No. 10); the Motion to Dismiss (Doc. No. 12); Plaintiff's Response in Opposition (Doc. No. 14); Defendants' Reply (Doc. No. 15); and the arguments of counsel for the parties at the June 24, 2021 hearing on the Motion to Dismiss (see Doc. No. 17).

[3]  The following facts are taken from the Complaint (Doc. No. 10) and are accepted as true for purposes of this Opinion.

[4]  53 PA. CONS. STAT. § 65601.

[5]  In deciding a motion to dismiss, the Court may consider matters of public record.  See Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) ("In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the [plaintiff's] claims are based upon these documents.").  The composition of the Board is a matter of public record.

and the compensation of the police officers."  53 PA. CONS. STAT. § 66902; see also Santiago v. Warminster Twp., 629 F.3d 121, 135 n.11 (3d Cir. 2010).  Defendant Jamie Gwynn is the Township Manager,[6] and Defendant Kevin McKeon is the Chief of Police.  (See Doc. No. 10 ¶¶ 4–5.)

On July 13, 2017, a police Sergeant in the Department (the "Sergeant") allegedly received compensation from the Township for hours that he did not actually work based upon a false submission by the Sergeant.  (See id. ¶¶ 9, 11, 13(c).)  After Plaintiff became aware of this "theft of employee hours[,]" he reported it to Manager Gwynn.  (Id. ¶ 140; see also id. ¶¶ 9, 13(c).)

According to Plaintiff, following this report of wrongdoing, Chief McKeon engaged in a pattern of harassment toward Plaintiff.  McKeon instructed another officer "not to talk to Plaintiff because he was a 'rat' and could not be trusted." (Id. ¶ 13(a).)  McKeon also "ignored Plaintiff, would not greet him, and did demeaning activities to him that he did to no other officer." (Id. ¶ 13(b).)  On August 24 or 25, 2017, Chief McKeon filed a complaint against Plaintiff's wife at her workplace for not saying "hi" to him. (Id. at ¶ 13(d).)  About a month later, on September 27, 2017, he filed a disciplinary charge against Plaintiff for his alleged mishandling of a traffic stop of a truck. (Id. ¶ 13(e).)

## 2.    First Loudermill Notice and Traffic Assignment

On October 6, 2017, Plaintiff mentioned to a member of the Township Board that Chief McKeon had reprimanded him.  (Id. ¶ 45.)  After so doing, Plaintiff was charged with insubordination and issued his first Loudermill[7] notice with a proposed one-day suspension. (Id.)

---

[6]   According to the Township's website, the Township Manager works in the Administration Department, "is appointed by the Board of Supervisors, and serves as the municipality's chief administrative officer to run the day to day operation of the municipality."  Administration, NEW  HANOVER  TOWNSHIP,  PA,  https://www.newhanover-pa.org/departments/administration.php.

[7]   "In Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985), the [United States] Supreme Court held that, prior to termination, a public employee with a property interest in

This notice was later withdrawn by Defendant Township, but Plaintiff alleges that Chief McKeon's harassment continued.  (Id.)

On October 13, 2017, Chief McKeon filed a disciplinary complaint against Plaintiff for reporting his harassment.  (Id. ¶ 13(f).)  On March 7, 2018, McKeon "fabricated a story to the [Manager Gwynn] that Plaintiff wanted all orders in writing."  (Id. ¶ 13(g).)  "On June 8, 2018, Chief McKeon yelled at Plaintiff for getting a car wash outside of [the Township]."  (Id. ¶ 13(h).)  On August 3, 2018, Chief McKeon had a confrontation with Plaintiff.  (Id. at ¶ 13(i).)  While Plaintiff was learning a new evidence system from county tech personnel, Chief McKeon stated to Plaintiff, "Get out of my way."  (Id.)  Another confrontation occurred a few weeks later, on August 27, 2018.  (Id. ¶ 13(j).)  Plaintiff alleges that Chief McKeon interrupted Plaintiff and put his hand up toward Plaintiff's face.  (Id.)  This pattern of harassment was "commonly known throughout the police department" and "Plaintiff had reported the harassment to a Corporal in the Department and other officers had witnessed and discussed it."  (Id. ¶ 14.)

Sometime in the late spring or early summer of 2018, Plaintiff "began testing the waters" to run for the office of Magisterial District Justice in a local Magisterial District, No. 38-2-03.  (Id. ¶ 15; see also id. ¶ 8.)  Several members of the Department asked Plaintiff about his intentions to run for the position.  (Id. ¶ 15.)  And "[i]n approximately August 2018, Plaintiff was called into a meeting with Chief McKeon and the department sergeant where Chief McKeon asked Plaintiff if he was running for [justice]."  (Id. ¶ 15.)

On November 20, 2018, Chief McKeon ordered Plaintiff to report to the New Hanover Township Recreation Center ("NHTRC") to assist Police Officer Fugelo with a speed trap.  (See

---

continued employment must be afforded 'a pretermination opportunity to respond, coupled with post-termination administrative [or judicial] procedures.'"  Morton v. Beyer, 822 F.2d 364, 367 (3d Cir. 1987) (quoting Loudermill, 470 U.S. at 547–48).

id. ¶ 16.)  Plaintiff went to the NHTRC, but Officer Fugelo did not go there.  (See id. ¶ 18.)  Surveillance video from the NHTRC captured Plaintiff reporting to the location pursuant to Chief McKeon's orders.  (See id. ¶ 35.)  During the speed trap assignment, Plaintiff received a radio call from Douglas Township related to a bank alarm.  (See id. ¶ 19.)  Plaintiff responded to the bank alarm appropriately.  (See id. at ¶ 20.)

Plaintiff alleges that later on Chief McKeon inaccurately claimed that Plaintiff never reported to his traffic duty assignment.  (See id. ¶ 21.)  Chief McKeon also claimed that Plaintiff lied to him about his attendance at the speed trap and asserted that Plaintiff was out of the Township or at home at the time he was to report to the NHTRC.  (See id. ¶ 16–17.)  After this incident, McKeon "brought Plaintiff up on a multitude of charges" arising from this incident, "including (1) unbecoming conduct, (2) neglect of duty, (3) leaving duty post, (4) unsatisfactory performance, (5) insubordination, (6) [un]truthfulness, and (7) performance of duty."  (Id. ¶ 32.)

### 3.   Weingarten Hearing, Second Loudermill Notice, and Loudermill Hearing

In response to McKeon's claims, Plaintiff requested a union proceeding known as a Weingarten hearing.[8]  (See id. ¶ 22.)  The Weingarten hearing was witnessed by Plaintiff's Union Representative, Corporal Dace Milligan.  (See id.)  Chief McKeon and Manager Gwynn were both present.  (See id. ¶¶ 25–26.)  At the hearing, Chief McKeon allegedly "lost his composure, shouting at Plaintiff and accusing Plaintiff of not going to an assigned traffic duty assignment."  (Id. ¶ 26.)  At the time, though, as noted, information existed that would have shown that Plaintiff did report to his traffic assignment.  (See id. ¶ 33.)  First, there was a traffic ticket issued by Officer Fugelo

---

[8]   In N.L.R.B. v. J. Weingarten, Inc., 420 U.S. 251 (1975), the United States Supreme Court held that a unionized employee is entitled to have a union representative present at an investigatory interview which the employee reasonably believes might result in disciplinary action.

that showed he was elsewhere at the time Plaintiff reported to the NHTRC.  (See id. ¶ 34.)  Second, there was the surveillance video from the NHTRC that showed Plaintiff reported as ordered.  (See id. ¶ 35.)  Despite multiple requests, the Township did not release this video to Plaintiff.  (See id. ¶ 38.)

On December 6, 2018, Chief McKeon and Manager Gwynn filed a second Loudermill notice against Plaintiff.  (Id. ¶ 36.)  This time, the notice informed Plaintiff that he would be terminated based on the charges investigated during the Weingarten hearing.  (See id. ¶ 36.)  A Loudermill hearing was held on these charges with Manager Gwynn present.  (See id. ¶ 25.)  During the hearing, Plaintiff alleges Chief McKeon incorrectly claimed that "certain details" told to him by Plaintiff during the Weingarten hearing, presumably concerning the speed trap assignment, were false.  (See id. ¶ 24.)  Moreover, at an Unemployment Compensation hearing held on December 17, 2018, Chief McKeon again inaccurately testified about what Plaintiff said regarding the speed trap.  (See id. ¶ 41.)

B.     **Plaintiff's Resignation and the 2019 Election for Magisterial District Justice**

Pursuant to the terms of his union grievance procedure, Plaintiff had the right to appeal the outcome of his hearings to Manager Gwynn, then to the Board of Supervisors, and finally, if necessary, to proceed to arbitration.  (See Doc. No. 10 ¶ 43.)  Plaintiff decided, however, that given Manager Gwynn's support of Chief McKeon, he would not receive a fair hearing in front of Manager Gwynn during the appeal.  (See id. ¶ 44.)  Further, Plaintiff believed that an appeal to the Board would be futile, given the October 6, 2017 incident involving a member of the Board that led to his first Loudermill notice.  (See id. ¶ 45.)  Because he believed he would not get a fair and unbiased hearing on appeal, Plaintiff retired in lieu of termination prior to a decision at the second Loudermill hearing.  (See id. ¶ 48.)

After Plaintiff resigned from the Department, he ran in November 2019 for Magisterial District Justice in District 38-2-03.  (See id. ¶¶ 8, 54.)  Plaintiff's campaign opponent was incumbent Magisterial District Justice Maurice H. Saylor.  (See id. ¶ 71.)

### C.    Post-Resignation Brady Referral

The day after Plaintiff retired, Chief McKeon submitted Plaintiff's name to the Montgomery County District Attorney's Office's ("MCDAO") to be placed on a Brady List[9] based on credibility concerns arising from Plaintiff's alleged false testimony at the Loudermill hearing. (See id. ¶ 51.)  Plaintiff asserts that a Brady referral is effectively "the end of a police officer's career and makes him unemployable in law enforcement."  (Id. ¶ 52.)  Defendants never gave Plaintiff notice that his name was being submitted to the MCDAO for placement on the Brady List.  (See id. ¶ 58.)  Further, Plaintiff alleges the Township and Chief McKeon failed to send all relevant information to the MCDOA when it submitted Plaintiff's name for the Brady List, including the county dispatch transcript and the transcript of the Loudermill hearing.  (See id.) Plaintiff submits that, at the time of the referral, Defendants were aware not only that the allegations were false, but also that Plaintiff was running for the local Magisterial District Justice seat.  (See id. ¶ 54.)  Plaintiff claims that the referral was done intentionally to prejudice his electoral chances.  (See id.)

On April 3, 2019, a Deputy District Attorney at the MCDAO responded to Chief McKeon's Brady referral in a letter ("MCDAO Letter," or the "Letter").  (See id. ¶ 71.)  The Letter states, in pertinent part:

> The [Montgomery County] District Attorney's Office recommended Psota's 'Notice of Charges and Recommendation of Termination' be given to the defense

---

[9]    In Brady v. Maryland, 373 U.S. 83 (1963), the United States Supreme Court held that prosecutors have a constitutional obligation to turn over to criminal defendants favorable evidence that is material to their guilt or innocence.  A Brady List referral indicates that a law enforcement official has been deemed untrustworthy.  (Doc. No. 10. ¶ 51.)

of all cases involving him due to '. . . allegations of dishonesty on the part of Officer Psota.'

(Id. ¶ 72.)

After Chief McKeon received the MCDAO Letter, the Township, Chief McKeon and/or Manager Gwynn, "or individuals acting on Defendants' behalf, revealed the [MCDAO Letter] . . . to Plaintiff's campaign opponent, incumbent . . . Justice . . . Saylor . . . and/or to the campaign of Plaintiff's opponent, [known as] the 'Friends of Maurice "Mo" Saylor.'" (Id. ¶ 71.) The Friends of Maurice "Mo" Saylor used the above-quoted language from the Letter to prepare an "attack mailer" and handout for distribution during the 2019 primary and general elections for Magisterial District Justice. (Id. ¶ 72.) The attack mailer and handout contained the negative language from the Letter and accused Plaintiff of dishonesty as a police officer based on the Brady referral and/or his placement on the MCDAO Brady List. (See id. ¶¶ 62, 69, 72.)

In late April or early May 2019, Plaintiff became aware of the attack mailer, and on May 10, 2019, Plaintiff, through a letter sent by his counsel, warned the Township that Plaintiff's referral to the Brady List was done for partisan purposes. (See id. ¶¶ 62–63.) The letter stated, in pertinent part:

> Former Officer Psota is spending a lot of time, energy and resources in running for Magisterial District Justice. He takes any referral to place him on a Brady List with the utmost seriousness, as he does any use of this information, which is baseless, to impact on his reputation and his ability to successfully run for public office. We will look closely at the action[s] [of] any person or any entity (such as New Hanover Township or the New Hanover Township Police Department) if this information proves to be true.

(Id. ¶ 64.)

On May 18, 2019, three days before the primary election for Magisterial District Justice, the attack mailer was publicly disseminated. (See id. ¶¶ 69–70, 72.) In the attack mailer, Justice Saylor's campaign quoted from the MCDAO Letter. (See id. ¶ 72.) Four of the five Township

8

Board members campaigned for Justice Saylor "in the primary and general election[s]," and on November 5, 2019, they distributed the handout at the polls.  (Id. ¶¶ 77–84, 93.)

On August 26, 2019, the Montgomery County Lodge No. 14 Fraternal Order of the Police wrote a letter supporting Plaintiff and indicated that the driving force in placing him on the Brady List was his judicial campaign.  (See id. ¶ 74.)  Furthermore, in an October 18, 2019 letter, Montgomery County District Attorney Kevin R. Steele wrote to Plaintiff that the "April 3rd letter sent to Defendant Chief McKeon was not a 'negative determination concerning [Plaintiff's] credibility' and further stated that '[t]he Commonwealth has not taken any position regarding [Plaintiff's] credibility or his conduct in this matter.'"  (Id. ¶ 90.)

Plaintiff avers that the improper disclosure of the MCDAO Letter led to his loss in the campaign for the Magisterial District Justice position.  (See id. ¶ 113(c)–(d).)  Further, Plaintiff claims that he was not hired at another police department due to his placement on the Brady List. (See id. ¶ 98.)  Due to the pattern of harassment that led to Plaintiff's departure from the Department and his referral for placement on the Brady List, Plaintiff brought the instant action against Defendants.

### D.    This Litigation and Defendants' Motion to Dismiss the Amended Complaint

The facts just recited, which are sourced from the Amended Complaint and are viewed as true for purposes of deciding a motion to dismiss, are alleged to support seventeen (17) claims made by Plaintiff in this case.  There are claims against Defendant Township and claims against Defendants McKeon and Gwynn in their individual capacities. [10]  They are lengthy and duplicative of claims made against each Defendant, and are as follows:

- Count I:      Plaintiff v. Defendant New Hanover Township for Violation of

---

[10]   As noted, the Amended Complaint did not name the Police Department as a defendant.  (See Doc. No. 10.)  On July 8, 2021, the parties agreed to dismiss the claims against the Department. (See Doc. No. 19.)

Pennsylvania's Whistleblower Law, 43 PA. CONS. STAT. § 1421, et seq.;

- Count II:     Plaintiff v. Defendant Kevin McKeon for Violation of Pennsylvania's Whistleblower Law, 43 PA. CONS. STAT. § 1421, et seq.;

- Count III:     Plaintiff v. Defendant Jamie Gwynn for Violation of Pennsylvania's Whistleblower Law, 43 PA. CONS. STAT. § 1421, et seq.;

- Count IV:     Plaintiff v. Defendant New Hanover Township for Deprivation of Plaintiff's Liberty Interest in Employment, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, U.S. CONST. amend. XIV;

- Count V:     Plaintiff v. Defendant Kevin McKeon for Deprivation of Plaintiff's Liberty Interest in Employment, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, U.S. CONST. amend. XIV;

- Count VI:     Plaintiff v. Defendant Jamie Gwynn for Deprivation of Plaintiff's Liberty Interest in Employment, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, U.S. CONST. amend. XIV;

- Count VII:     Plaintiff v. Defendant New Hanover Township for Deprivation of Plaintiff's Liberty Interest in Reputation and Continued Employment in the Law Enforcement Field, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, U.S. CONST. amend. XIV ("Stigma Plus Cause of Action");

- Count VIII:     Plaintiff v. Defendant Kevin McKeon for Deprivation of Plaintiff's Liberty Interest in Reputation and Continued Employment in the Law Enforcement Field, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, U.S. CONST. amend. XIV ("Stigma Plus Cause of Action");

- Count IX:     Plaintiff v. Defendant Jamie Gwynn for Deprivation of Plaintiff's Liberty Interest in Reputation and Continued Employment in the Law Enforcement Field, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, U.S. CONST. amend. XIV ("Stigma Plus Cause of Action");

- Count X:     Plaintiff v. Defendant New Hanover Township for Retaliating against Plaintiff for asserting his rights under the First Amendment to the United States Constitution, U.S. CONST. amend. I;

- Count XI:     Plaintiff v. Defendant Kevin McKeon for Retaliating against Plaintiff for

asserting his rights under First Amendment to the United States Constitution, U.S. CONST. amend. I;

- Count XII:       Plaintiff v. Defendant Jamie Gwynn for Retaliating against Plaintiff for asserting his rights under the First Amendment to the United States Constitution, U.S. CONST. amend. I;

- Count XIII:      Plaintiff v. Defendant Kevin McKeon for Defamation, in violation of Pennsylvania Law;

- Count XIV:       Plaintiff v. Defendant Jamie Gwynn for Defamation, in violation of Pennsylvania Law;

- Count XV:        Plaintiff v. Defendant Kevin McKeon for False Light Defamation, in violation of Pennsylvania Law;

- Count XVI:       Plaintiff v. Defendant Jamie Gwynn for False Light Defamation, in violation of Pennsylvania Law;

- Count XVII:      Plaintiff v. Defendant New Hanover Township for Deprivation of Plaintiff's Liberty Interest in Reputation and Continued Employment in the Law Enforcement Field, in violation of Article I of the Pennsylvania Constitution, PA. CONST. art. 1, §§ 1, 11.

(See Doc. No. 10 ¶¶ 135–317.)

In sum, these claims and the defenses to them can be grouped together generally as follows: (1) claims arising under federal law against the Township, which implicate the Township's municipal liability under Monell v. Dep't of Soc. Servs., 436 U.S. 690 (1978), (Counts IV, VII, and X); (2) claims arising under Pennsylvania state law against the Township, which implicate the Township's sovereign immunity pursuant to Pennsylvania's Political Subdivisions Tort Claims Act (Counts I and XVII); (3) claims arising under federal law against the Individual Defendants, which raise whether they are entitled to qualified immunity (Counts V, VI, VIII, IX, XI, and XII); and (4) claims arising under Pennsylvania state law against the Individual Defendants, which raise whether they are entitled to immunity pursuant to Pennsylvania's Political Subdivisions Tort Claims Act (Counts II, III, XIII, XIV, XV, and XVI).  Plaintiff also asserts in the Amended Complaint that he

is entitled to punitive damages on each of the seventeen (17) claims alleged.  In the Motion to Dismiss, Defendant challenges the sufficiency of these claims under Federal Rule of Civil Procedure 12(b)(6), and asserts that they are barred based on the defenses noted.

For reasons that follow, the Court will grant Defendants' Motion to Dismiss with respect to Plaintiff's Whistleblower Law claims (Counts I–III), Due Process liberty interest in employment claims (Counts IV–VI), Due Process liberty interest in reputation claims (Counts VII–IX), and the claim against the Township for violation of Plaintiff's rights under the Pennsylvania Constitution insofar as it seeks monetary damages (Count XVII).  The Court will deny Defendants' Motion to Dismiss the First Amendment claims (X–XII), defamation claims against the Individual Defendants (Counts XIII, XIV), false light defamation claims against the Individual Defendants (Counts XV, XVI), and the claim against the Township for violation of Plaintiff's rights under the Pennsylvania Constitution insofar as it seeks equitable relief (Count XVII).  Finally, with respect to Plaintiff's claim for punitive damages, the Court will only dismiss this claim against the Township, but not against the Individual Defendants.

## III.    STANDARD OF REVIEW

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009).  After Iqbal, it is clear that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to defeat a Rule 12(b)(6) motion to dismiss.  Id. at 678; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).  "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  Tatis v. Allied Interstate, LLC, 882 F.3d 422, 426 (3d Cir. 2018) (quoting Iqbal, 556 U.S. at 678).  Facial plausibility is "more than a sheer possibility that a

12

defendant has acted unlawfully." Id. (quotation marks omitted) (quoting Iqbal, 556 U.S. at 678). Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quotation marks omitted) (quoting Iqbal, 556 U.S. at 678).

Applying the principles of Iqbal and Twombly, the Third Circuit Court of Appeals in Santiago, 629 F.3d 121, set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a Rule 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim."  Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."  Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Id. at 130 (alteration in original) (quoting Iqbal, 556 U.S. at 675, 679).  The inquiry is normally broken into three parts: "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts.  Fowler v. UPMC Shadyside, 578 F.3d 203, 210–11 (3d Cir. 2009) (citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234–35 (3d Cir. 2008)).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  Iqbal, 556 U.S. at 679 (second alteration in original) (citation omitted).  The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and

common sense." Id.

When determining whether a claim is plausible, a district court may also consider any affirmative defenses raised by the moving party. "Technically, the Federal Rules of Civil Procedure require that affirmative defenses be pleaded in the answer." Robinson v. Johnson, 313 F.3d 128, 135 (3d Cir. 2002) (citing Fed. R. Civ. P. 12(b)). However, the so-called "Third Circuit Rule" allows affirmative defenses to be raised in a 12(b)(6) motion. Id.; see also Ball v. Famiglio, 726 F.3d 448, 459 n.16 (3d Cir. 2013) cert. denied, 572 U.S. 1020 (2014) ("[A] number of affirmative defenses that are not listed in Rule 12(b) [can] still be made by motion, provided that the basis of the defense [is] apparent on the face of the complaint."); Bethel v. Jendoco Const. Corp., 570 F.2d 1168, 1174 (3d Cir. 1978) ("[A]n affirmative defense may be raised on a 12(b)(6) motion if the predicate establishing the defense is apparent from the face of the complaint."). For instance, a statute of limitations defense may be raised in a motion to dismiss if "the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." Robinson, 313 F.3d at 135 (quoting Hanna v. U.S. Veterans' Admin. Hosp., 514 F.2d 1092, 1094 (3d Cir. 1975)); see also Eddy v. Virgin Islands Water & Power Auth., 256 F.3d 204, 210 n.3 (3d Cir. 2001) ("qualified immunity may be raised in a motion to dismiss at the pleading stage . . . ."); Hartmann v. Time, Inc., 166 F.2d 127, 140 n.3 (3d Cir. 1947) (explaining that the defense of res judicata may be raised in the answer or in a motion to dismiss). Thus, in addition to the claims asserted by Plaintiff, the Court may also consider here the defenses of qualified immunity and sovereign immunity propounded by Defendants.

IV.     **ANALYSIS**

A.      **Plaintiff's Claims Against the Township**

Plaintiff alleges claims against the Township: (1) pursuant to 42 U.S.C. § 1983 for violations of his rights under the United States Constitution, and (2) for violations arising under Pennsylvania state law. The Court will address first the federal claims against the Township, which requires a determination of whether the Township may be found liable under the framework set forth by the United States Supreme Court in Monell v. Dep't of Soc. Servs., 436 U.S. 690 (1978). Afterward, the Court will address Plaintiff's state law claims against the Township.

1.      **Section 1983 Claims Against the Township: Monell Liability**

Plaintiff asserts claims against the Township for violations of his constitutional rights pursuant to 42 U.S.C. § 1983. Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

Whether the Township may be held liable for Plaintiff's Section 1983 claims turns on whether he has alleged sufficient facts to establish a Monell claim. In Monell, the United States Supreme Court held that municipal entities can be subject to Section 1983 liability in limited circumstances. 436 U.S. at 690. This Court has elaborated on Monell as follows:

> The gravamen of Monell and its progeny is that "recovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered." Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986). In other words, the constitutional deprivation must have its origin in the policy, custom, or deliberate indifference of the municipality, and liability based on the actions of city officials exists only where it can be shown that the officials acted in accordance with that policy, custom, or

15

> deliberate indifference.  See Monell, 436 U.S. at 694.  Moreover, municipalities
> cannot be held liable under Section 1983 for acts of its employees based on the
> doctrine of respondeat superior or for other forms of vicarious liability.  See id. at
> 692 (noting that the language of Section 1983 "cannot be easily read to impose
> liability vicariously on governing bodies solely on the basis of the existence of an
> employer-employee relationship with a tortfeasor"); see also Reitz v. Cnty. of
> Bucks, 125 F.3d 139, 146 (3d Cir. 1997) ("[M]unicipal liability simply cannot be
> predicated upon a showing of respondeat superior.").

Ewing v. City of Philadelphia, No. 20-3170, 2021 WL 1581186, at *6 (E.D. Pa. Apr. 21, 2021).

Thus, under Monell, to state a claim against a municipality under Section 1983, a plaintiff must establish that (1) a constitutionally protected right has been violated, and (2) the alleged violation resulted from a municipal policy, custom, or deliberate indifference.  See Monell, 436 U.S. at 694–95; Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990).  The Court will address each of these prongs in turn.

### a.      Monell Liability: Violations of Plaintiff's Constitutional Rights

As noted above, Plaintiff asserts Section 1983 claims against the Township for violations of his constitutional rights in Counts IV, VII, and X of the Amended Complaint.  In Count IV, Plaintiff alleges procedural due process claims for deprivation of his liberty interest in his employment as a police office.  (See Doc. No. 10 ¶¶ 168–91.)  In Count VII, Plaintiff alleges procedural due process claims for deprivation of his liberty interest in his reputation and continued employment under the theory of "stigma-plus."  (See id. ¶¶ 192–212.)  Finally, in Count X, Plaintiff asserts claims of retaliation in violation of his First Amendment rights.  (See id. ¶¶ 213–51.)

### i.      Fourteenth Amendment Liberty Interest in Employment

In Count IV, Plaintiff asserts that the Township deprived him, without due process of law, of a protected liberty interest in his employment at the Department.  (See id. ¶¶ 168–75.)

"To state a claim under § 1983 for deprivation of procedural due process rights, a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the

Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'" Hill v. Borough of Kutztown, 455 F.3d 225, 233–34 (3d Cir. 2006) (quoting Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000)).  Here, Defendants do not dispute that Plaintiff "had a protected property interest in employment."  (Doc. No. 12-1 at 11.) Rather, they argue that he fails to state a procedural due process violation because the pre-deprivation process afforded to him was constitutionally adequate.  Moreover, post-deprivation procedures were available to him, but he decided not to pursue them because he terminated his employment, and this action would preclude his claim.  (See id. at 11; see also id. at 10, 12–13.) In response, Plaintiff avers that the pre-deprivation Loudermill hearing did not satisfy the requirements of procedural due process because its outcome was predetermined, and any post-deprivation proceeding would have been futile based on the "intense history and pattern of harassment" alleged in the Amended Complaint.  (Doc. No. 14-2 at 7.)

Here, Plaintiff cannot establish that Defendants violated his right to procedural due process because the process afforded him was constitutionally adequate, and he failed to avail himself of post-deprivation procedures before an impartial arbiter.  To satisfy procedural due process, a public employee is entitled to "a pre[-]termination opportunity to  respond, coupled with post-termination administrative [or judicial] procedures."  Moffitt v. Tunkhannock Area Sch. Dist., 160 F. Supp. 3d 786, 793 (M.D. Pa. 2016) (quoting Morton, 822 F.2d at 367).

The process afforded to Plaintiff here was constitutionally adequate.  The Amended Complaint demonstrates that Plaintiff was afforded pre-deprivation Weingarten and Loudermill hearings and a post-deprivation proceeding before an impartial tribunal. [11]  A pre-deprivation

---

[11]   As mentioned supra, and to avoid confusion due to the lengthy recitation of facts in the Amended Complaint, Plaintiff received two Loudermill notices, only one of which proceeded to a hearing, and a separate Weingarten hearing.  The first Loudermill notice, issued on October

hearing "must at least entail: 1) 'oral or written notice of the charges,' 2) 'an explanation of the employer's evidence,' and 3) 'an opportunity for the employee to tell his side of the story.'"  Id. (quoting Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 545 (1985)).

Here, Plaintiff had "oral or written notice of the charges" brought against him following his report of the time theft and the November 2018 incident involving the speed trap assignment. The Amended Complaint alleges that he received Loudermill notices describing the charges and the proposed discipline and termination.  (See Doc. No. 10 ¶¶ 32, 36.)  Plaintiff also was afforded an "explanation of the [Township's] evidence" and "an opportunity . . . to tell his side of the story." Moffitt, 160 F. Supp. 3d at 793 (quoting Loudermill, 470 U.S. at 545).  Although the first Loudermill notice was withdrawn by the Township, he claims that both he and Chief McKeon testified at the Weingarten and the second Loudermill notice hearings regarding their version of events.  (See id. ¶¶ 22–28, 54, 59.)

Plaintiff argues, however, that the pre-deprivation, second Loudermill hearing "was a miscarriage of due process and . . . a deliberate attempt to terminate [Plaintiff] unjustly" because the hearing "intentionally came to false conclusions despite the true facts . . . ." (Doc. No. 14-2 at 7; see also id. at 8.)  In essence, Plaintiff argues this Loudermill hearing failed to comport with procedural due process because it was biased against him and had a predetermined outcome.  But "in . . . an employment termination case, 'due process [does not] require the state to provide an

---

6, 2017, followed Plaintiff's mention to a member of the Board of his reprimand by Chief McKeon for his handling of a traffic stop.  (See Doc. No. 10 ¶ 45.)  This first Loudermill notice proposed a one-day suspension but was withdrawn by the Township.  (See id.)  Following the conflict between Plaintiff and Chief McKeon regarding Plaintiff's speed trap assignment, Plaintiff requested a Weingarten hearing, which "was witnessed by Plaintiff's Union Representative, Corporal Dave Milligan."  (See id. ¶ 22.)  Next, on December 6, 2018, Plaintiff received a second Loudermill notice, which sought his termination.  (See id. ¶ 36.)  The second Loudermill notice proceeded to a hearing, but Plaintiff resigned from the Department prior to a decision.  (See id. ¶¶ 23–24, 48.)

impartial decisionmaker at the pre-termination hearing. . . .'"  McDaniels v. Flick, 59 F.3d 446, 459 (3d Cir. 1995) (citation omitted).  "So long as Defendants afforded [Plaintiff] the right to a post-deprivation hearing before an impartial tribunal . . . [Plaintiff] [can]not present a plausible claim for relief based on . . . alleged bias in [a] 'sham' pre-deprivation hearing."  Symonies v. McAndrew, 416 F. Supp. 3d 377, 390 (M.D. Pa. 2019).[12]  Moreover, "so long as adequate post-termination proceedings are provided, the fact that 'the pre-termination hearing to which [the plaintiff] was subjected had a predetermined outcome is ultimately immaterial to his procedural due process claim.'"  Id. at 391 (quoting Luciani v. City of Philadelphia, 643 F. App'x 109, 112 (3d Cir. 2016)).

Here, the Amended Complaint alleges that while working at the Department, Plaintiff was a union member and that the union had a grievance procedure in place for its members.  (See Doc. No. 10 ¶¶ 22, 43, 58.)  After the Loudermill hearing, "[t]he [u]nion grievance procedure had as next steps . . . an appeal to the Township Manager, then an appeal to the Board of Supervisors, and next an appeal to arbitration."  (Id. ¶ 43.)  Because an appeal to arbitration was part of the grievance procedure, Plaintiff was afforded a post-deprivation proceeding before an impartial tribunal; and because Plaintiff was afforded pre-deprivation notice and two opportunities to respond (the Weingarten hearing and Loudermill hearing), and a post-deprivation proceeding before an impartial tribunal, procedural due process was satisfied.  See Loudermill, 470 U.S. at 547–48;

---

[12]  See also Dykes v. Southeastern Pa. Transp. Auth., 68 F.3d 1564, 1571 (3d Cir. 1995) ("Where a due process claim is raised against a public employer, and grievance and arbitration procedures are in place, we have held that those procedures satisfy due process requirements 'even if the hearing conducted by the Employer . . . [was] inherently biased.'") (quoting Jackson v. Temple Univ., 721 F.2d 931, 933 (3d Cir. 1983)); Heneghan v. Northampton Cmty. Coll., 493 F. App'x 257, 259–60 (3d Cir. 2012) ("Generally, due process does not require an impartial decisionmaker at the pre[-]termination hearing provided the state affords 'a neutral tribunal at the post-termination stage.'") (quoting McDaniels, 59 F.3d at 460).

Dykes v. Southeastern Pa. Transp. Auth., 68 F.3d 1564, 1565 (3d Cir. 1995) (holding "that where an adequate grievance/arbitration procedure is in place and is followed, a plaintiff has received the due process to which he is entitled under the Fourteenth Amendment").

Plaintiff claims, however, that he chose to retire instead of completing "[t]he [post-deprivation] [u]nion grievance procedure" because "he knew he wasn't going to get a fair and unbiased hearing based on how . . . [the] Township responded" in the past to his allegations of harassment and complaints about Chief McKeon making false accusations against him. (Doc. No. 10 ¶¶ 43, 48; see also id. ¶ 76; Doc. No. 14-2 at 6–7.) For this reason, Plaintiff contends that any appeal to the next level would have been futile, and his failure to exhaust the union grievance procedure should not preclude his procedural due process claims against the Township. (See Doc. No. 14-2 at 6–9.)

The problem with this contention, however, is that Third Circuit precedent precludes procedural due process claims "when procedural protection [is made] available and the plaintiff has simply refused to avail himself of them." Alvin, 227 F.3d at 116; see also Dykes, 68 F.3d at 1572 (finding no due process violation where plaintiff failed to request arbitration that was available to him, "[e]ven where . . . plaintiff allege[d] that the defendants acted in concert to deprive him both of a meaningful hearing and of arbitration"). Thus, to state a procedural due process claim, "a plaintiff must have taken advantage of the processes that are available to him . . . unless those processes are unavailable or patently inadequate." Alvin, 227 F.3d at 116.

As discussed supra, a post-deprivation arbitration procedure was available to Plaintiff. (See Doc. No. 10 ¶ 43.) "A procedure is inadequate . . . '[w]hen . . . there is evidence that the procedures are a sham.'" Companiony v. Murphy, 658 F. App'x 118, 122 (3d Cir. 2016) (quoting Alvin, 227 F.3d at 118). Plaintiff has not offered any evidence that the post-deprivation arbitration

20

proceeding would be a "sham."  See id. (affirming motion to dismiss due process claim where plaintiff withdrew from post-termination hearing process and failed to provide evidence "that any further hearing would 'not be held in a fair and impartial manner'") (quoting Alvin, 227 F.3d at 119).  Although he contends the Loudermill hearing was a sham, a due process claim arising from alleged flaws in a pre-deprivation hearing cannot be sustained where the plaintiff has failed to take advantage of available post-deprivation proceedings.  See Alvin, 227 F.3d at 116; McDaniels, 59 F.3d at 460; Symonies, 416 F. Supp. 3d at 391.  Accordingly, because Plaintiff withdrew from the union grievance procedure, thereby failing to avail himself of post-termination processes before an impartial arbiter, "and also [has] not shown that such processes were inadequate," his procedural due process claim fails.  Companiony, 658 F. App'x at 122.[13]

Nor has Plaintiff plausibly alleged a claim of constructive discharge.  Plaintiff contends that he was constructively discharged without due process of law because after his "forced retirement[,]" he was no longer a union employee and thus did not have any post-deprivation remedy available.  (Doc. No. 14-2 at 6; see also id. at 7–8.)  In support of his constructive discharge claim, Plaintiff points to the pattern of harassment, retaliation, and false allegations by Defendants.  (See Doc. No. 10 ¶¶ 48, 104; see also Doc. No. 14-2 at 6–7.)  Defendants submit, however, that Plaintiff fails to plausibly allege constructive discharge because he has not alleged sufficient facts to overcome the presumption under the law that his resignation was voluntary.  (See Doc. No. 12-1 at 12–13.)

---

[13]  See also Alvin, 227 F.3d at 116 ("If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants."); Symonies, 416 F. Supp. 3d at 392 ("Because there was an adequate post-deprivation grievance/arbitration procedure provided for in the [Collective Bargaining Agreement] . . . that was not alleged to have been utilized by [the plaintiff], he has not presented a plausible due process claim.").

"If an employee retires of his own free will, even though prompted to do so by some action of his employer, he is deemed to have relinquished his property interest in his continued employment for the government, and cannot contend that he was deprived of his due process rights." Leheny v. City of Pittsburgh, 183 F.3d 220, 227 (3d Cir. 1999). Accordingly, Plaintiff must "present[] evidence to establish that [his] resignation or retirement was involuntarily procured." Id. This can be accomplished in one of two ways. Plaintiff must show that his employer: "(1) . . . force[d] the resignation or retirement by coercion or duress, or (2) . . . obtain[ed] the resignation or retirement by deceiving or misrepresenting a material fact to the employee." Id. at 228. Here, Plaintiff does not allege that he retired due to deception. Rather, he contends he was "forced" to retire, i.e., his resignation was coerced. (Doc. No. 14-2 at 6.)

In Forrester v. Solebury Twp., the plaintiff, a police officer for Solebury Township, was accused of fraudulently obtaining worker's compensation benefits and, consequently, was "suspended with [the] intent to dismiss." No. 20-4319, 2021 WL 662290, at *2 (E.D. Pa. Feb. 19, 2021). After attending a Loudermill hearing, the plaintiff received a termination memorandum informing him that the Solebury Township manager had adopted the police chief's recommendation that the plaintiff be "immediate[ly] discharge[d]." Id. The termination memorandum also instructed the plaintiff that he had the "right to appeal and challenge [the Solebury Township manager's] decision." Id. According to the plaintiff, the Solebury Township police chief threatened him that "if he proceeded to fight and did not retire[,] he could be charged with insurance fraud, face criminal liability and lose his pension" and told him that "if he retired, Solebury Township would not contact the District Attorney's Office about his departure." Id. at *3. Consequently, the plaintiff decided to retire in lieu of termination and forego his right to appeal the Solebury Township manager's decision. Id.

Thereafter, the plaintiff in <u>Forrester</u> brought suit alleging, <u>inter</u> <u>alia</u>, that he was deprived of his liberty interest in his continued employment as a police officer without due process of law. <u>Id.</u> at *9.  In <u>Forrester</u>, the court dismissed his due process claim because the plaintiff was unable "to demonstrate that the procedures available to him pre-resignation failed to provide him due process of law."  <u>Id.</u>  The court also rejected his argument that he was constructively discharged and, in so doing, noted that:

> The Third Circuit has identified a 'non-exhaustive list of factors' to evaluate a constructive discharge claim due to coercion or duress:  (1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice [he] was given; (3) whether the employee was given a reasonable time in which to choose; (4) whether the employee was permitted to select the effective date of the resignation; and (5) whether the employee had the advice of counsel.

<u>Id.</u> at *10 (citing <u>Judge v. Shikellamy Sch. Dist.</u>, 905 F.3d 122, 125 (3d Cir. 2018).

Further, in <u>Forrester</u>, the court also elaborated that "[t]he standard for determining whether a resignation was forced by coercion or duress is objective . . . . The ultimate issue is not what Plaintiff himself felt or believed, but whether a reasonable person under the circumstances would have felt compelled to resign."  <u>Id.</u> (internal citations and quotations omitted).

Here, similar to <u>Forrester</u>, and reviewing the facts in the Amended Complaint in the light most favorable to Plaintiff, a reasonable person in his situation would not have felt compelled to resign.  Plaintiff "had, knew of and failed to exercise an opportunity to appeal the Township's termination decision instead of resigning."  <u>Id.</u> at *11; (<u>see</u> <u>also</u> Doc. No. 10 ¶ 43).  As a result, Plaintiff "ultimately waived his chance to present exculpatory evidence in a second forum by choice" by his resignation.  <u>Forrester</u>, 2021 WL 662290, at *11; (<u>see</u> <u>also</u> Doc. No. 10 ¶ 48). Additionally, although Plaintiff does not allege in his Amended Complaint when exactly he resigned, it occurred "on or after December 6, 2018, but before May 20, 2019."  (<u>See</u> Doc. Nos.

10 ¶¶ 36, 48; 12-1 at 4.)  Given this timeframe, Plaintiff also had adequate time between receiving his second <u>Loudermill</u> notice on December 6, 2018 and his resignation to "consult counsel and consider his options." <u>Forrester</u>, 2021 WL 662290, at *11; (<u>see also</u> Doc. No. 10 ¶¶ 32, 36, 48.) Moreover, while Plaintiff does not allege that he consulted with counsel before deciding to retire, he does allege that he had the opportunity to consult with his union representative.  (<u>See</u> Doc. No. 10 ¶ 22.)  Finally, Plaintiff was not given some alternative to resignation that he would find acceptable.  He alone selected the date of his resignation.  Thus, even when considering his allegations in the Amended Complaint as true, he has not asserted sufficient facts to overcome the presumption that his resignation was voluntary.

For all these reasons, Defendants' Motion to Dismiss will be granted as to Plaintiff's procedural due process claim in Count IV.

### ii.   Fourteenth Amendment Liberty Interest in Reputation: Stigma Plus

In Count VII, Plaintiff asserts that the Township violated his rights under the Fourteenth Amendment Due Process Clause because its actions caused him reputational harm and prevented him from continuing his career as a police officer by submitting his name to the Montgomery County District Attorney's Office ("MCDAO") for inclusion on its <u>Brady</u> List of untrustworthy officers.  (<u>See</u> Doc. No. 10 ¶¶ 192–212.)  To establish a claim for deprivation of a liberty interest in reputation under Section 1983, "a plaintiff must show a stigma to his reputation <u>plus</u> deprivation of some additional right or interest." <u>Hill</u>, 455 F.3d at 236 (emphasis in original).

"In order to satisfy the 'stigma' prong, a plaintiff must show (1) that the stigmatizing statement was made publicly, and (2) that the statement was substantially and materially false." <u>Kocher v. Larksville Borough</u>, 548 F. App'x 813, 820 (3d Cir. 2013).  Here, Defendants argue they merely submitted the allegedly stigmatizing <u>Brady</u> referral to the MCDAO, and not to the public

at large.  (See Doc. No. 15 at 5.)  Defendants also assert that the information underlying the <u>Brady</u> referral—namely, Plaintiff's alleged false testimony at the <u>Loudermill</u> hearing—was true.  (See Doc. No. 12-1 at 15.)

At this stage of the proceeding, the Court is tasked with determining whether Plaintiff has stated "a claim to relief that is plausible on its face" and, in so doing, must accept the facts pled as true.  <u>Tatis</u>, 882 F.3d at 426 (quoting <u>Iqbal</u>, 556 U.S. at 678).  Plaintiff alleges in his Amended Complaint that Defendants "or individuals acting on Defendants' behalf, revealed the [MCDAO Letter] . . . to Plaintiff's campaign opponent, incumbent . . . Justice . . . Saylor . . . and/or to the campaign of Plaintiff's opponent, [known as] the 'Friends of Maurice "Mo" Saylor.'"  (Doc. No. 10 ¶ 71.)  The information in the Letter concerning Plaintiff's dishonesty as a police officer was then disseminated by the campaign of Plaintiff's political adversary to defeat Plaintiff in the race to become a District Justice.  (See id. ¶¶ 69–70, 72, 77–84, 93.)  On its face, these facts, when accepted as true, plausibly allege that Defendants caused defamatory or false statements about Plaintiff to be made to the public at large.  Further, it is not appropriate at this motion to dismiss stage for the Court to inquire into the veracity of the information underlying the <u>Brady</u> referral, as it is a question of fact and better suited for subsequent review or trial.

Defendants also argue that "no liberty interest of constitutional significance is implicated when the employer has alleged merely improper or inadequate performance, incompetence, neglect of duty or malfeasance."  (Doc. No. 12-1 at 14) (quoting <u>Fox v. Cheltenham Twp. Auth.</u>, No. 12-716, 2012 WL 2273424, at *4 (E.D. Pa. June 18, 2012)).  According to Defendants, Plaintiff has not suffered any stigma because the MCDAO Letter merely concerned Plaintiff's job

performance.  Defendants' characterization is unavailing.  The present case is distinguishable from the authorities cited by Defendants.[14]

Unlike the plaintiffs in the cases Defendants rely on, the <u>Brady</u> referral accused Plaintiff of far more disparaging conduct than simple incompetence or poor job performance.  The <u>Brady</u> referral accused Plaintiff of violating the public trust bestowed upon him as a public servant by providing false testimony and directly goes to Plaintiff's "reputation, honor, or integrity."  <u>Ersek v. Township of Springfield</u>, 102 F.3d 79, 83–84 (3d Cir. 1996) (citing <u>Codd v. Velger</u>, 429 U.S. 624, 627–29 (1977)); (<u>see</u> <u>also</u> Doc. No. 10 ¶ 32.).  Such accusations concern "the level of credibility that is essential to participate in law enforcement."  (Doc. No. 14-2 at 10.)  Therefore, Plaintiff has satisfied the "stigma" prong.

The Court now turns to the "plus" prong of the "stigma-plus" analysis.  "[R]eputation alone is not an interest protected by the Due Process Clause."  <u>Clark v. Township of Falls</u>, 890 F.2d 611,

---

[14]   <u>See</u> <u>Fox v. Cheltenham Twp. Auth.</u>, No. 12-716, 2012 WL 2273424, at *4 (E.D. Pa. June 18, 2012) (finding that a paramedic's allegations that the township doctor "falsely stated or implied that [the paramedic] was responsible for a breach of protocol, impacted a patient's outcome, and needed further training . . . [did] not involve [the paramedic's] honor or integrity" in dismissing due process claim); <u>Chinoy v. Pa. State Univ.</u>, No. 11-1263, 2012 WL 727965, at *4–5 (M.D. Pa. Mar. 6, 2012) (dismissing due process claim where "Plaintiff claim[ed] she was deprived of a liberty interest in her reputation when Defendants publicized falsehoods that she had voluntarily resigned from her employment and that she was not a team player"); <u>Young v. Kisenwether</u>, 902 F. Supp. 2d 548, 558–59 (M.D. Pa. 2012) (Plaintiff's allegation that "his public firing created and disseminated a false and defamatory impression that Plaintiff's performance as an employee was poor or subpar . . . [was] insufficient to satisfy the stigma requirement to state a due process deprivation of liberty interest claim") (internal citations and quotations omitted); <u>Kohn v. Sch. Dist. of Harrisburg</u>, 817 F. Supp. 2d 487, 498 (M.D. Pa. 2011) (dismissing due process claim of former school superintendent who alleged he was deprived of a liberty interest in his reputation because the mayor "falsely stated that Kohn failed to perform his job and that keeping Kohn as a superintendent would be a crime against the students"); <u>Poteat v. Harrisburg Sch. Dist.</u>, 33 F. Supp. 2d 384, 393 (M.D. Pa. 1999) (former superintendent's claim that investigative report into school district that allegedly contained "negative comments about his abilities" failed to establish a due process violation because "[c]harges of incompetence do not implicate the liberty interest a public employee has in the manner of discharge").

619 (3d Cir. 1989).  The "plus" prong of the analysis also requires "an alteration or extinguishment of 'a right or status previously recognized by state law.'"  Hill, 455 F.3d at 237 (quoting Paul v. Davis, 424 U.S. 693, 711 (1976)).  Plaintiff alleges that he was deprived of his "protected liberty interest in working in a particular profession under the United States Constitution" because of the stigma he suffered due to the Brady referral.  (Doc. No. 14-2 at 9).  Defendants respond that Plaintiff was not actually deprived of any right or liberty interest since he voluntarily resigned from his position and therefore has not made a sufficient showing to satisfy the "plus" prong.  (See Doc. No. 12-1 at 16.)

The Court has already determined that no liberty interest was implicated regarding Plaintiff's departure from the Department, since Plaintiff was afforded adequate pre- and post-termination procedures and has not shown that his decision to resign was involuntary.  Therefore, Plaintiff is effectively claiming that the liberty interest he was deprived of was his right to work as a public servant in other, future opportunities—whether at other police departments or in connection with his bid to serve as Managerial District Justice.  Accordingly, the Third Circuit decision in Clark is instructive:

> Clark contends that the testimony that his future job prospects were significantly affected by defendants' continued investigations of him, disparaging allegations, and innuendos demonstrates that something more than merely his reputation was adversely affected.  Indeed, a former township manager testified that towns "don't try to hire people with this kind of baggage."  In addition, Clark testified that he had informally discussed the prospect of employment with an agent of the Federal Bureau of Investigation but that, after the 1985 incident in which he was accused of complicity in the purchase of allegedly illegal listening devices, the FBI was no longer interested in employing him.  Our holding in Sturm [v. Clark, 835 F.2d 1009 (3d Cir. 1987)] that the loss of potential clients is not sufficient to transform a reputation interest into a liberty interest is governing here, particularly because there was no testimony that within the statute of limitations Clark had actually applied for another job and been rejected.  The possible loss of future employment opportunities is patently insufficient to satisfy the requirement imposed by Paul that a liberty interest requires more than mere injury to reputation.

890 F.2d at 620 (internal citation omitted).

Similarly here, any argument that Plaintiff was deprived of his liberty interest in the possibility of obtaining future employment is insufficient to satisfy the "plus" prong of the "stigma-plus" test.  Id.  And most importantly, Plaintiff does not have any ascertainable liberty or property interest in serving as an elected official, as courts have held that even officials who are actually elected do not possess any property interest in the office they hold.  See Parks Miller v. Ctr. Cty., No. 4:15-CV-1754, 2016 WL 2752645, at *17 (M.D. Pa. May 11, 2016), aff'd sub nom. Miller v. Cty. of Ctr., 702 F. App'x 69 (3d Cir. 2017) ("[A]s an elected official, Parks Miller does not have a property interest in her office, and to the extent that her due process claim rests on a property interest, it will be dismissed, as well."); Sweeney v. Tucker, 473 Pa. 493, 524 (1977) (finding it "clear" that, to the extent a member of the Pennsylvania House of Representatives did have "a property interest [in his office], it [was] a highly circumscribed one" because "[a]n elected office is a public trust, not the private domain of the officeholder.") (internal citation omitted).  Therefore, because Plaintiff has not shown that he was deprived of a liberty interest, his claim of violation of his Fourteenth Amendment Due Process interest in reputation fails and Count VII will be dismissed.

### iii.    First Amendment Retaliation Claim

In Count X, Plaintiff alleges a First Amendment retaliation claim against the Township under Section 1983.  (See Doc. No. 10 ¶¶ 226–51.)  He asserts that he was retaliated against for reporting the time theft by the Sergeant.  (See Doc. No. 10 ¶¶ 9, 226–51).  In their Motion to Dismiss, Defendants argue that Plaintiff fails to state a retaliation claim because Plaintiff "did not engage in any protected conduct" and, even if Plaintiff's speech was protected, Plaintiff cannot establish that his speech was a substantial or motivating factor in the alleged retaliatory action. (See Doc. No. 12-1 at 17; see also id. at 18–20.)  In the Response, Plaintiff contends that his speech

was protected because the "report of theft of time was not within the scope of his duties and was made outside the chain of command to Manager Gwynn." (Doc. No. 14-2 at 13.)

The First Amendment to the United States Constitution provides that "Congress shall make no law…abridging the freedom of speech" of the people. U.S. CONST. amend. I. The Supreme Court has held that First Amendment protections extend to public employees because "public employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." Garcetti v. Ceballos, 547 U.S. 410, 417 (2006). Accordingly, "[t]o succeed on a First Amendment retaliation claim, [Plaintiff] must show his activity was (1) protected conduct under the First Amendment that (2) was a substantial motivating factor in the alleged retaliatory action. . . .  If [Plaintiff] shows both, the burden shifts to the Township to prove it would have taken the same action regardless of the protected conduct." Dondero v. Lower Milford Twp., 5 F.4th 355, 361 (3d Cir. 2021) (citing Munroe v. Cent. Bucks Sch. Dist., 805 F.3d 454, 466 (3d Cir. 2015)).

Under this test, the Court must initially evaluate whether Plaintiff's activity was protected by the First Amendment. This first inquiry is a question of law. See Dougherty v. Sch. Dist., 772 F.3d 979, 987 (3d Cir. 2014) (citing Connick v. Myers, 461 U.S. 138, 148 n.7 (1983)). The speech of a public employee is constitutionally protected "when (1) in making it, the employee spoke as a citizen[;] (2) the statement involved a matter of public concern[;] and (3) the government employer did not have an adequate justification for treating the employee different from any other member of the general public as a result of the statement he made." Falco v. Zimmer, 767 F. App'x 288, 300 (3d Cir. 2019) (citing Hill, 455 F.3d at 241–42 (3d Cir. 2006)) (internal quotations omitted) (alterations in original).

29

The first inquiry in determining whether a public employee's speech is protected is determining whether the employee spoke as a private citizen.  See Garcetti, 547 U.S. at 418.  "If the answer is no, the employee has no First Amendment cause of action . . . If the answer is yes, then the possibility of a First Amendment claim arises."  Id.  The Third Circuit has held that "in order to be protected by the First Amendment, a plaintiff's activity ordinarily must not have been undertaken pursuant to his job responsibilities as a public employee."  Falco, 767 F. App'x at 300 (citing Garcetti, 547 U.S. at 421–22).  The Supreme Court has explained that "the controlling factor is [whether the public employee's] expressions were made pursuant to his official duties."  Garcetti, 547 U.S. at 411.  The Court clarified that "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform."  Id. at 424–25.

The second inquiry in determining whether a public employee's speech is protected under the First Amendment is whether the speech involved a matter of public or private concern.  If "a public employee's speech involv[ed] matters of public concern [the speech] is protected," whereas if the speech "involv[ed] matters of private concern [the speech] is not protected."  Falco, 767 F. App'x at 302.  Speech relates to a matter of public concern when "it can be fairly considered as relating to any matter of political, social or other concern to the community."  Connick, 461 U.S. at 146.  "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement."  Hill, 455 F.3d at 242.  Further, "[c]ourts are instructed to 'take into account the employee's motivation as well as whether it is important to our system of self-government that the expression take place."  LaTorre v. Downingtown Area Sch. Dist., 253 F. Supp. 3d 812, 822 (E.D. Pa. 2017) (citing Munroe, 805 F.3d at 467).

Plaintiff alleges that he engaged in constitutionally protected conduct when he reported to Manager Gwynn the improper submission of time by the Sergeant.  (See Doc. No. 10 ¶ 11.)

Plaintiff contends that his "report was made in his capacity as a private citizen with a public concern for the misuse of public funds." (Id. ¶ 10.)  Conversely, Defendants argue that "the time theft issue raised by [Plaintiff] relates solely to matters within the scope of his duties as a police officer" and is therefore not constitutionally protected speech.  (See Doc. No. 12-1 at 19.) Defendant posits that "knowledge of whether a supervisor improperly submitted time, could only be gleaned in [Plaintiff's] capacity as a police officer and presence in the Police Department." (Id. at 19–20.)

Here, Plaintiff was speaking as a private citizen on a matter of public concern when he reported the Sergeant's time theft.  In Garcetti, the Court held that because a public employee "expressed his views inside his office, rather than publicly, is not dispositive."  547 U.S. at 420. Further, the court held that the fact that the employee's speech "concerned the subject matter of [the employee's] employment . . . [was] nondispositive."  Id. at 421.  Thus, it is not dispositive that Plaintiff reported the information to Manager Gwynn.  Nor is it dispositive that Plaintiff's report concerned a matter he learned during his employment.  Rather, Plaintiff filed the report due to his concern for the misuse of public funds.  (See Doc. No. 10 ¶ 10.)  As the Supreme Court noted: "a public employee's testimony regarding corruption in a public program and misuse of state funds 'obviously involve[d] a matter of significant public concern.'"  Lane v. Franks, 573 U.S. 228, 241 (2014) (citing Garcetti, 547 U.S. at 425).  Further, "speech disclosing public officials' misfeasance is protected."  Falco, 767 F. App'x at 303 (citing Swineford v. Snyder Cty. Pa., 15 F.3d 1258, 1271 (3d. Cir. 1994)); see also McGreevy v. Stroup, 413 F.3d 359, 365 (3d Cir. 2005) ("Speech involving government impropriety occupies the highest rung of First Amendment protection.") (citing Swineford, 15 F.3d at 1274).

Defendants argue that Plaintiff's speech is not protected because the Third Circuit has held that "complaints up the chain of command about issues related to an employee's workplace duties[—]for example . . . misconduct by other employees[—]are within an employee's official duties." Morris v. Philadelphia Housing Auth., 487 F. App'x 37, 29 (3d Cir. 2012). This argument also fails because "Defendant Gwynn was not a part of the police department and he was not in Plaintiff's chain of command." (Doc. No. 10 ¶ 10.) Further, "it was not part of Plaintiff's duties to monitor [the Sergeant's] time or to discuss the matter with the Township Manager." (Id.). Thus, this is not a case where "the mode and manner of [Plaintiff's] speech [to Manager Gwynn] was only as an ordinary corollary to [Plaintiff's] position as a government employee," in which case the speech would not be protected. Cf. De Ritis v. McGarrigle, 861 F.3d 444, 454 (3d Cir. 2017).

Finally, the Court must determine whether Defendants had "'an adequate justification for treating the [Plaintiff] different from any other member of the general public' as a result of the statement he made." Hill, 455 F.3d at 241–42 (citing Garcetti, 547 U.S. at 417). "This consideration reflects the importance of the speaker's expressions and employment. A government entity has broad discretion to restrict speech when it acts in its role as employer, but restrictions it imposes must be directed at speech that has some potential to affect the entity's operations." Garcetti, 547 U.S. at 418. But, based on the record before the Court at this stage of the proceeding, Defendants were not justified in treating Plaintiff differently than a member of the general public because of his complaint about the Sergeant. See Hill, 455 F.3d at 243 (declining to resolve this question at the motion to dismiss stage). Therefore, at this stage of the proceeding, Plaintiff has sufficiently pled that his speech was protected by the First Amendment.

Since Plaintiff engaged in speech protected by the First Amendment, the next question is whether Plaintiff has established that his protected activity was a substantial or motivating factor

in Defendants' alleged retaliation. If Plaintiff has made a sufficient showing to establish this element, "the burden shifts to the Township to prove it would have taken the same action regardless of the protected conduct." Dondero, 5 F.4th at 361 (citing Munroe, 805 F.3d at 466).

Defendants argue that Plaintiff has failed to establish that his protected activity was a substantial or motivating factor in the alleged retaliation. Defendants reason that Plaintiff "cannot establish any causal connection between his complaint about the sergeant . . . and his resignation from employment" because the delay between Plaintiff's complaint and the alleged adverse action taken against him was "too long for [Plaintiff] to establish any plausible claim for causation." (Doc. No. 12-1 at 20–21.)

The Third Circuit has recently outlined what it refers to as "three avenues to establish causation" in a First Amendment retaliation claim. Dondero, 5 F.4th at 361. These avenues consist of: (1) "an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action"; (2) "a pattern of antagonism coupled with timing"; or (3) "the record as a whole," which "may reveal evidence implying causation." Id. at 361–62. While Defendants' arguments appear to focus on this first "avenue" (i.e., the temporal proximity between the protected activity and the allegedly retaliatory conduct), Plaintiff argues that the second factor applies here— that "[t]his case involves a pattern of antagonism coupled with timing." (Doc. No. 14-2 at 14.)

At this stage of the proceeding, Plaintiff's argument will prevail. At the very least, this issue is best decided at a later stage, when the Court will have a fuller record to address whether "the record as a whole . . . reveal[s] evidence implying causation." Dondero, 5 F.4th at 362; see also McGreevy, 413 F.3d at 366 ("[I]t is for the jury to decide whether Plaintiff's constitutionally protected activity was a substantial or motivating factor in Defendant's [alleged First Amendment retaliation]"); Falco, 767 F. App'x at 310 (the question of whether the plaintiff's protected activity

was a substantial or motivating factor in the alleged retaliation generally "presents a question of fact for the jury") (internal citation omitted).

But "[a]t the motion to dismiss stage, [Plaintiff] must only produce some evidence, direct or circumstantial, of this element that is 'enough to raise a right to relief above the speculative level.'"  Falco, 767 F. App'x at 310 (quoting Twombly, 550 U.S. at 555).  Here, the pattern of harassment coupled with timing that Plaintiff alleges occurred after his complaint of time theft satisfies the causation element.  Therefore, Plaintiff has made an adequate showing on his claim of First Amendment retaliation.

      **b.**      **Monell: Second Prong Analysis Regarding Retaliation Claim**

      **i.**      **Township Policy, Custom, or Deliberate Indifference**

Because Plaintiff has sufficiently alleged a First Amendment free speech retaliation claim, the Court will now turn to the second prong of a Monell claim: whether the Amended Complaint shows that a municipal policy, custom, or deliberate indifference was the cause of the alleged constitutional violation.  See Monell, 436 U.S. at 694–95.  There are a variety of ways a plaintiff may establish the existence of a municipal policy or custom to satisfy Monell.  For example, a plaintiff can cite an official policy.  See id., 436 U.S. at 690 (holding a municipality may be sued under Section 1983 when it "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."); See also Kelly v. Borough of Carlisle, 622 F.3d 248, 263 (3d Cir. 2010) ("'Policy' includes official proclamations made by municipal decision makers with final authority . . . ").  A policy also may arise from the municipality delegating to employees the authority to set policy or from the municipality ratifying actions taken by employees without policymaking authority.  See id. at 264.

Custom, on the other hand, "is defined as practices of state officials . . . so permanent and well settled as to virtually constitute law."  Id. (citing Berg v. Cty. of Allegheny, 219 F.3d 261, 275

(3d Cir. 2000)).  A plaintiff may establish custom by specifically referring to "multiple incidents" implicating that a particular custom exists.  See Harris v. City of Philadelphia, 171 F. Supp. 3d 395, 401–02 (E.D. Pa. 2016) (finding a custom where there were "multiple incidents" of police officers using reckless and excessive force in their use of batons).  A plaintiff may also establish custom through a statistical analysis of lawsuits against a municipality for a violation of a particular constitutional right.  See Simpson v. Ferry, 202 F. Supp. 3d 444, 452 (E.D. Pa. 2016) (permitting a Monell claim to proceed following a review of the plaintiff's statistical analysis about the number of lawsuits against the Philadelphia Police Department for use of excessive force).

In the Amended Complaint, Plaintiff alleges that the Individual Defendants violated his free speech rights by retaliating against him for reporting the time theft by the Sergeant.  The retaliation consisted of initiating termination proceedings against him and referring him to the MCDAO for placement on its Brady List based upon demonstrably false allegations.  (See Doc. No. 10 ¶¶ 8, 22–39.)  Defendants counter by arguing that "the Amended Complaint lacks sufficient allegations that New Hanover Township had a municipal practice, custom, policy and procedure of condoning and/or acquiescing in violations of citizens' [c]onstitutional rights, and in particular Psota's First and Fourteenth Amendment rights."  (Doc. No. 12-1 at 6.)  Defendants reason that Plaintiff's allegations are "composed almost entirely of legal conclusions couched as factual allegations, [] threadbare recitals of the elements of the cause of action, and [] totally devoid of further factual enhancement."  (Id. at 6–7.)

After careful review of the Amended Complaint, it is evident that Plaintiff's allegations do not contain sufficient facts demonstrating a policy or custom of retaliation by the Township necessary to satisfy Monell.  As Defendants correctly point out, the Amended Complaint must include "specific factual allegations referencing the conduct, time, place, and persons responsible

for official municipal policy or custom." Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005). Further, "merely including 'the phraseology that [a municipality's] policy or custom violated [P]laintiff's constitutional rights, [when] unadorned with supporting facts, [does not] cure any defect under Federal Rule of Civil Procedure 12(b)(6).'" Saleem v. Sch. Dist. of Philadelphia, No. 12-3193, 2013 WL 5763206, at *3 (E.D. Pa. Oct. 24, 2013) (citing O'Hara v. Cty. of Allegheny, No. 12-818, 2013 WL 501374, at *4 (W.D. Pa. Feb. 8, 2013)); see also Wood v. Williams, 568 F. App'x 100, 104 (3d Cir. 2014) (conclusory and general claims simply paraphrasing Section 1983 are insufficient to survive a Rule 12(b)(6) motion because "they fail[] to satisfy the rigorous standards of culpability and causation" required to state claim for municipal liability) (citing McTernan v. City of York, 564 F.3d 636, 685–59 (3d Cir. 2009)).

Here, the Amended Complaint contains conclusory and general statements that the Township had a policy or custom of retaliating against an employee for exercising his First Amendment right to free speech.  In this regard, Plaintiff alleges that the retaliation was caused by the Township's "policy regarding how to treat police officers who expressed opinions and reports facts about matters of public concern" and "policy regarding when to send Brady List requests to the District Attorney's Office, and when to retract such Brady requests."  (Doc. No. 10 ¶ 130.) However, Plaintiff asserts these policies existed merely because he was on the receiving end of the retaliation.  Nowhere in the Amended Complaint does Plaintiff specifically identify any "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" to establish a policy, Monell, 436 U.S. at 690, nor does he allege any patterns of behavior by the Township evidencing a custom that is "so permanent and well settled as to virtually

constitute law."[15]   Kelly, 622 F.3d at 263.   Accordingly, Plaintiff has not established that a Township policy or custom caused the retaliation against him.

A plaintiff also may satisfy the second prong of Monell by showing that official policymakers were deliberately indifferent to known incidents of constitutional violations towards its inhabitants.   See City of Canton v. Harris, 489 U.S. 378, 388–92 (1989).   In the Third Circuit, to make a claim for deliberate indifference, a plaintiff must show that: "(1) municipal policymakers know that employees will confront a particular situation[,] (2) the situation involves a difficult choice or a history of employees mishandling[,] and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights."   Estate of Roman v. City of Newark, 914 F.3d 789, 798 (3d Cir. 2019) (alterations in original) (quoting Doe v. Luzerne Cnty., 660 F.3d 169, 180 (3d Cir. 2011)).   Neither the Amended Complaint nor Plaintiff's Response attempts to establish any of these factors to make out a claim for deliberate indifference, nor do the facts set forth in the Amended Complaint support such a finding.   Instead, Plaintiff merely asserts the Township "acted with deliberate indifference" towards the alleged violations of Plaintiff's constitutional rights without providing anything more substantive.   (Doc. No. 10 ¶¶ 132–34.)   This is a legal conclusion. At the very least, Plaintiff needed to allege facts to support the deliberate indifference prong, which he did not do.   To the contrary, he alleges in the Amended Complaint that Chief McKeon and Manager Gwynn acted intentionally.   (See id. ¶¶ 52, 54, 115.)   Thus, Plaintiff has not made a showing of deliberate indifference to satisfy Monell.

### ii.      Delegation and Ratification

The Court now turns to what Plaintiff maintains is the crux of his argument: that the Township either: (1) delegated its policymaking authority to the Individual Defendants, or (2)

---

[15]   In fact, nowhere in the Amended Complaint does Plaintiff even claim that a municipal custom caused the alleged constitutional violations.   (See Doc. No. 10.)

ratified the decisions of the Individual Defendants, after the fact, as being in accordance with municipal policy.  (See Doc. No. 14-2 at 3–5.)

Regarding this argument, Defendants assert in their Motion that Plaintiff's Monell claim is insufficient because "he fails to set forth sufficient factual allegations about the conduct of a specific policymaker."  (Doc. No. 12-1 at 7.)  In support of this argument, Defendants cites to authorities from this Circuit holding that a complaint alleging municipal liability under Monell must "allege conduct by a municipal decisionmaker" to survive a motion to dismiss.  (Id. at 7) (citing McTernan, 564 F.3d 658–59); see also Rees v. Office of Children and Youth, 473 F. App'x 139, 143 (3d Cir. 2012) (holding that a complaint cannot state a Monell claim if it "fails to link the alleged offending policies or customs to anyone within [a municipality] who had policy-making authority"); Andrews, 895 F.2d at 1481 (noting that a municipal decisionmaker in a Section 1983 case must possess "final, unreviewable discretion to make a decision or take an action").  The question of where decision-making authority lies for the purposes of municipal liability is "for the court to decide as a matter of law." Dolly v. Borough of Yeadon, 428 F. Supp. 2d 578, 284 (E.D. Pa. 2006) (internal citation omitted).

Here, it is undisputed that the Board is the final policymaker for the Township regarding its police force.  (See Doc. Nos. 14-2 at 5; 12-1 at 9); see also Santiago, 629 F.3d at 135 n.11 (citation and quotations omitted) ("[A]ll of the policymaking power, including over the local police force, is vested in the [Board of S]upervisors."); 53 PA. CONS. STAT. § 66902 ("The [B]oard . . . shall provide for the organization and supervision and determine the number and the compensation of the police officers.").

Indeed, Plaintiff does not attempt to argue that final policymaking authority for the Township lies somewhere other than with the Board.  (See Doc. No. 14-2 at 5.)  In the Amended

Complaint, Plaintiff alleges that the Individual Defendants violated his constitutional rights by initiating termination proceedings against him and referring him to the MCDAO for placement on its <u>Brady</u> List based upon demonstrably false allegations.  (See Doc. No. 10 ¶¶ 8, 22–39.)  He claims the Township is liable for this misconduct because the Board: (1) delegated to the Individual Defendants policymaking authority with respect to termination and <u>Brady</u> procedures involving police officers; and (2) ratified the Individual Defendants' unlawful decisions by failing to take corrective action.  (See <u>id.</u> ¶¶ 130–34.)  The Court will address each of these theories in turn.

"An employee who lacks policymaking authority can still bind the municipality if a municipal policymaker delegated power to the employee or ratified his decision." <u>Kelly</u>, 622 F.3d at 264.  With regard to delegation, "[s]imply going along with discretionary decisions made by one's subordinates, however, is not a delegation to them of the authority to make policy.  <u>Id.</u> (quoting <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 130 (1988)).  Further, courts have noted that the involvement of authorized policymakers in the decision-making process of subordinates weighs against a finding of delegated authority.  See <u>Andrews</u>, 895 F.2d at 1481 ("If there had been a complete delegation of authority, [authorized policymakers] would never gotten involved in this case.").

A finding that the Township delegated policymaking authority to Chief McKeon and Manager Gwynn is not supported by the allegations in the Amended Complaint, even when considering them in the light most favorable to Plaintiff.  As Defendants point out, Plaintiff "alleges in conclusory fashion" that the Township and the Board delegated final, policymaking authority to the Individual Defendants.  (Doc. No. 15 at 1; see also Doc. No. 10 ¶¶ 51, 68, 130.)  Plaintiff's theory is also contradicted by facts set forth in the Amended Complaint.  In this Complaint, Plaintiff alleges that Manager Gwynn testified that his "method of dealing with

potential terminations is to notify the Chairman of the Board of Supervisors and the Township's attorney and let them know what is going on throughout the entire process, and then discuss it with the Board." (Doc. No. 10 ¶ 47.) Thus, the Individual Defendants were ultimately "answerable in all of [their] decisions to the [Board]." Andrews, 895 F.2d at 1481. But these allegations do not show that the Board delegated policymaking authority to the Individual Defendants.

Plaintiff finds more support, however, on his claim that the Township ratified the decisions of the Individual Defendants. As set forth by the Supreme Court in Praprotnik:

> [Ratification occurs] when a subordinate's decision is subject to review by the municipality's authorized policymakers [because] they have retained the authority to measure the official's conduct for conformance with their policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

485 U.S. at 127 (emphasis in original).

As noted supra, the Amended Complaint states that Manager Gwynn's process of dealing with potential terminations involved remaining in close contact with the Board. (See Doc. No. 10 ¶ 47.) Plaintiff alleges that Manager Gwynn, the Board-appointed official tasked with the Township's daily operations,[16] notifies the Board's Chairman and the Township's attorney about potential law enforcement terminations, keeps them informed "throughout the entire process," and then discusses this decision with the full Board. (Id.) These assertions support the inference that the Board knew about, approved, and ratified the decision to file charges to terminate Plaintiff and approved of the reasons for so doing. This inference is further buttressed by Plaintiff's allegations that Manager "Gwynn was present at both" pre-deprivation hearings. (Id. ¶ 25.) Taken together,

---

[16] See supra note 5 (quoting Administration, NEW HANOVER TOWNSHIP, PA, https://www.newhanover-pa.org/departments/administration.php) ("The Township Manager is appointed by the Board . . . and serves as the municipality's chief administrative officer to run the day to day operation of the municipality.").

these allegations "allow[] the [C]ourt to draw the reasonable inference that the [Township]" approved the decision to terminate Plaintiff and the basis for doing so, thereby ratifying the Individual Defendants' actions. Tatis, 882 F.3d at 426 (quotations omitted) (quoting Iqbal, 556 U.S. at 678).

Furthermore, Plaintiff has alleged sufficient facts to show that the Board approved Chief McKeon's decision to refer Plaintiff to the MCDAO for inclusion on the Brady List and also approved the reasons for doing so. In the Amended Complaint, Plaintiff alleges the Individual Defendants committed First Amendment retaliation because the day after he resigned, they submitted to the MCDAO the Brady referral based upon the false termination charges. (See Doc. No. 10 ¶ 51.) He claims the Brady referral was made for, inter alia, "partisan purposes[]" and "to impact his chances for election as a Magisterial District Judge . . . ." (Id. ¶ 63.)

Plaintiff argues that in response to the Brady referral, a Deputy District Attorney sent Chief McKeon the MCDAO Letter, stating that the MCDAO "recommended [Plaintiff's] 'Notice of Charges and Recommendation of Termination' be given to the defense of all cases involving him due to '. . . allegations of dishonesty on the part of [Plaintiff].'" (Id. ¶ 72; see also id. ¶¶ 73, 90.) After Plaintiff entered the 2019 election for Magisterial District Justice, he learned that he would soon be subject to a public attack mailer accusing him of dishonesty as a police officer. (See id. ¶¶ 62–63.) He alleges that on May 10, 2019, his counsel sent the Township a letter warning that:

> [Plaintiff] is spending a lot of time, energy and resources in running for Magisterial District Justice. He takes any referral to place him on a Brady List with the utmost seriousness, as he does any use of this information, which is baseless, to impact on his reputation and his ability to successfully run for public office. We will look closely at the action any person or any entity (such as New Hanover Township or the New Hanover Township Police Department) if this information proves to be true.

(Id. ¶ 64.)

Despite this letter from Plaintiff's counsel, the Board "took no action" and eight days letter, the attack mailer quoting directly from the MCDAO Letter was publicly circulated.  (<u>Id.</u> ¶ 65; <u>see also id.</u> ¶¶ 69, 71–73.)  An identical handout also was prepared and distributed at the polls.  (<u>See id.</u> ¶¶ 72, 81–84, 93.)  Because the only individuals with access to the MCDAO Letter were the Deputy District Attorney who sent the letter and Chief McKeon, Plaintiff claims the Township, the Individual Defendants, or others acting on their behalf revealed the MCDAO Letter to the campaign of his political opponent, Justice Saylor.  (<u>See id.</u> ¶ 71.)  These allegations are sufficient to raise an inference that the Township, the Individual Defendants, or someone acting at their direction publicly disclosed the MCDAO Letter.

Further, the Amended Complaint states that four out of the five Board members campaigned for Justice Saylor "in the primary and general election," and on November 5, 2019, these members distributed the handout accusing Plaintiff of dishonesty at the polls.  (<u>Id.</u> ¶¶ 77–84, 93.) Plaintiff claims that one of the members told voters at a local polling place to "vote for [Justice Saylor], he is not the one who lies" and "called Plaintiff a 'liar' in public at the polls."  (<u>Id.</u> ¶¶ 85, 88.)  When Plaintiff confronted this member with a letter sent to him by the MCDAO stating that the office "has not taken any position regarding [Plaintiff's] credibility[,]" the member replied, in front of several voters, "How do I even know that letter is real?"  (<u>Id.</u> ¶¶ 87, 90; <u>see also id.</u> ¶ 86.)  Based on all these allegations, and viewing them in the light most favorable to Plaintiff, the Amended Complaint plausibly shows that the Board approved the <u>Brady</u> referral by Chief McKeon and Manager Gwynn, and their "partisan" reasons for doing so.  (<u>Id.</u> ¶ 63; <u>see also id.</u> ¶ 39.)

Finally, the fact that Plaintiff does not point to a specific Township policy or custom resulting in repeated constitutional violations by the Township is not fatal to his claim to impose liability here.  Any argument to this effect overlooks the rationale underlying <u>Monell</u>'s theory of

municipal liability.  As the Supreme Court noted in <u>Pembaur</u>:

> The "official policy" requirement was intended to distinguish acts of the <u>municipality</u> from acts of <u>employees</u> of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.  <u>Monell</u> reasoned that recovery from a municipality is limited to acts that are, properly speaking, acts "of the municipality"—that is, acts which the municipality has officially sanctioned or ordered.
>
> With this understanding, it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances.  No one has ever doubted, for instance, that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body—whether or not that body had taken similar action in the past or intended to do so in the future—because even a single decision by such a body unquestionably constitutes an act of official government policy . . . [W]here action is directed by those who establish governmental policy, the municipality is equally responsible whether the action is to be taken only once or to be taken repeatedly.  To deny compensation to the victim would therefore be contrary to the fundamental purposes of § 1983.

475 U.S. at 479–81 (internal citations omitted) (emphases in original).

Thus, the single instance of retaliation against Plaintiff alleged in the Amended Complaint may properly be used to impose liability on the Township under the framework set forth by <u>Monell</u>.

For all these reasons, the Amended Complaint alleges sufficient facts to establish that the Township ratified the retaliatory actions taken by Chief McKeon and Manager Gwynn to place Plaintiff on the <u>Brady</u> list and in their attempt to terminate him.  Thus, Plaintiff has satisfied the second prong under <u>Monell</u> and therefore may proceed with his claim against the Township for violation of his First Amendment rights.

### 2.    Plaintiff's State Law Claims Against the Township

Having addressed Plaintiff's federal claims against the Township, the Court now turns to Plaintiff's remaining claims against it under Pennsylvania state law.  In the Amended Complaint, Plaintiff alleges the Township: (1) violated the Pennsylvania Whistleblower law (Count I) (<u>see</u> Doc. No. 10 ¶¶ 135–45); and (2) violated the Pennsylvania Constitution (Count XVII) (<u>see</u> <u>id.</u> ¶¶

306–17).  In their Motion, the Township argues these claims should be dismissed on the merits and because it is entitled to governmental immunity.  (See Doc. No. 12 at 22–25, 33–34.)  The Court will begin with its claim of immunity.

### a.    Immunity Under the Political Subdivision Tort Claims Act

The Township argues it is entitled to sovereign immunity under the Political Subdivision Tort Claims Act ("PSTCA"), 42 PA. CONS. STAT. § 8541, et seq., and for this reason cannot be liable to Plaintiff on the state law claims.  (See Doc. No. 12 at 33–34.)  Under the PSTCA, "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person."  42 PA. CONS. STAT. § 8541.  The PSTCA contains nine exceptions to this general rule of immunity.[17]  42 PA. CONS. STAT. § 8542(b).  None of these exceptions apply.

Consequently, starting with the state constitutional claim alleged in Count XVII, the Township is immune from liability on this claim only insofar as Plaintiff seeks monetary damages, as opposed to equitable relief which will be addressed, infra.  See Sameric Corp. of Delaware, Inc. v. City of Philadelphia, 142 F.3d 582, 600 (3d Cir. 1998) ("The City is immune from Sameric's claims arising under . . . the Pennsylvania Constitution because the [PSTCA] grants it immunity from claims for monetary damages except with respect to eight specific types of tortious conduct, none of which is applicable here."); Cornish v. City of Philadelphia, No. 14-6920, 2015 WL 3387052, at *9 (E.D. Pa. May 26, 2015) ("[O]ur Court of Appeals has held that the [PSTCA] grants immunity to municipalities from claims for monetary damages arising under the Pennsylvania

---

[17]   The exceptions cover: (1) vehicle liability; (2) care, custody, or control of personal property; (3) real property; (4) trees, traffic controls and street lighting; (5) utility service facilities; (6) streets; (7) sidewalks; (8) care, custody, or control of animals; and (9) sexual abuse.  42 PA. CONS. STAT. § 8542(b).

44

Constitution which do not fall with any of [the PSTCA's] enumerated exceptions.") (internal citation omitted).

However, the PSTCA does not shield the Township from liability under Plaintiff's Whistleblower claims.  See Taha v. Bucks Cty., No. 12-6867, 2014 WL 695205, at *4 (E.D. Pa. Feb. 21, 2014) (". . . no [PSTCA] immunity would exist where the Commonwealth specifically has allowed in another law for the possibility that civil damages may be recoverable, as is the case, for example, under . . . the Whistleblower Law") (internal quotations and citations omitted).  Thus, the Court will address in further detail, infra, Plaintiff's Whistleblower claim against the Township.

### b.      Pennsylvania Whistleblower Law

In Count I, Plaintiff asserts a claim against the Township for violation of Pennsylvania's Whistleblower Law, 43 PA. CONS. STAT. § 1421, et seq.  (See Doc. No. 10 ¶¶ 135–67.)  The Whistleblower Law, in pertinent part, states:

> No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer as defined in this act.

43 PA. CONS. STAT. § 1423(a).

In the Amended Complaint, Plaintiff asserts that "[t]he theft of employee hours reported by Plaintiff . . . is an instance of 'waste' or 'wrongdoing' as defined by the Whistleblower Law." (Doc. No. 10 ¶¶ 140, 151, 162.)  In their Motion, Defendants respond that: (1) Plaintiff's Whistleblower claims are time-barred;  (2) Plaintiff cannot establish a prima facie case for violations of the Whistleblower Law under the statutory definitions of "waste" and "wrongdoing"; and (3) Plaintiff has not sufficiently established that his complaint regarding the Sergeant caused his alleged constructive discharge.  (See Doc. No. 12-1 at 22–24.)

Regarding the argument that Plaintiff's Whistleblower claims are time-barred as a matter of law, (id. at 22), the Whistleblower Law provides that a violation may be asserted "within 180 days after the occurrence of the alleged violation." 43 PA. CONS. STAT. § 1424(a). As Defendants correctly point out, Pennsylvania courts have held that, despite the statute's use of permissive language, this 180-day limitation "is mandatory, and courts have no discretion to extend it." O'Rourke v. Pennsylvania Dep't of Corr., 730 A.2d 1039, 1042 (Pa. Commw. Ct. 1999).

Here, it is evident that Plaintiff's Whistleblower Law claims are barred by this 180-day limitation. As Plaintiff points out in his Amended Complaint, this case was initiated "on or about" April 15, 2020. (See Doc. No. 10 ¶ 6.) This would mean that, to satisfy the 180-day limitation, the alleged violation must have occurred after October 15, 2019. Turning to the facts alleged in the Amended Complaint, Plaintiff complained of the time theft sometime before July 13, 2017, (see id. ¶13; see also Doc. No. 12-1 at 22) and was constructively discharged on or after December 6, 2018 and before May 10, 2019. (See Doc. No. 10 ¶¶ 36, 48, 63.) Neither of these events fall within the 180-day limitation.

In his Response, Plaintiff points to "activity by four out of the five then existing Township Supervisors in connection" with his bid for Magisterial District Justice and distribution of the MCDAO Letter in attempt to satisfy the timeframe limitation. (Doc. No. 14-2 at 15.) But the primary election occurred on May 21, 2019 and therefore not within the timeframe required under the Whistleblower Law. (See Doc. No. 15 at 7; see also Doc. No. 10 ¶ 69.) Further, while the general election—which occurred on November 5, 2019—would fall within the 180-day timeframe, the "alleged November campaign efforts do not constitute an 'adverse employment action'" for purposes of the Whistleblower Law, as Plaintiff's campaign for Magisterial District Justice had no relation to his employment as a police officer. (Doc. No. 15 at 7–8); see also

Greineder v. Masonic Homes of the R.W. Grand Lodge, F & AM of Pennsylvania, No. 13-2376, 2014 WL 1632143, at *5 (E.D. Pa. Apr. 23, 2014); Valenti v. Maher Terminals LLC, No. 14-7897 JLL, 2015 WL 3965645, at *4 (D.N.J. June 30, 2015).  As such, Plaintiff's Whistleblower Law claim against the Township is time-barred.

Notwithstanding this temporal impediment, Plaintiff has failed to establish a prima facie case for violation of the Whistleblower Law even when accepting the allegations in the Amended Complaint as true.  (See Doc. No. 12-1 at 23–24.)  Plaintiff alleges that his report of time theft concerned "waste" or "wrongdoing" as defined under the Whistleblower Law.  (See Doc. No. 10 ¶¶ 137, 148, 159.)  Under this law, "waste" is defined as "[a]n employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources."  43 PA. CONS. STAT. § 1422.  To constitute "waste," "the grievance must allege that the waste committed was substantial."  The Pennsylvania State Troopers Ass'n v. Pawlowski, No. 09-1748, 2010 WL 2490774, at *9 (M.D. Pa. June 16, 2010).

"Wrongdoing" is defined as "[a] violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer."  43 PA. CONS. STAT. § 1422.  Moreover, "[t]he Whistleblower Law specifically exempts complaints of misconduct that are not prefaced upon the violation of a particular law or regulation from its protections of complaints of wrongdoing."  Pawlowski, 2010 WL 2490774 at *9.

Contrary to Plaintiff's argument, however, one instance of a sergeant submitting time to the Township during which he did not work does not rise to the level of "substantial abuse, misuse, destruction or loss of funds or resources belonging to" the Township so as to constitute "waste"

47

under the Whistleblower Law.  Id. at *8–10.  Further, the complaint that the Sergeant spent "time . . . engaging in personal business when he was supposed to be working. . . is simply too vague to support a claim [alleging 'wrongdoing'] under the Whistleblower Law."  Id. at *10.  Additionally, Plaintiff "does not articulate a statute or regulation that [the Sergeant] violated by doing personal business during working hours, thus the internal grievance does not meet the statutory standard of a complaint of 'wrongdoing.'"  Id. at *10.  Consequently, Plaintiff fails to establish a prima facie case of violation of the Whistleblower Law.

Given that the Court has determined that Plaintiff's Whistleblower Law claims against the Township is time-barred and that Plaintiff has nonetheless failed to establish a prima facie case, the Court need not consider Defendants' remaining argument concerning causation.  Accordingly, Count I of the Amended Complaint will be dismissed.

### c.    Violation of Pennsylvania Constitution

In Count XVII of the Amended Complaint, Plaintiff asserts a claim against the Township for violation of Plaintiff's reputational rights under the Pennsylvania Constitution.  (See Doc. No. 10 ¶¶ 306–17.)  As noted supra, the Township possesses immunity under the PSTCA from claims for monetary relief arising under the Pennsylvania Constitution.

However, it is true that "remedies such . . . injunctive relief are available remedies under the Pennsylvania Constitution."  Algerio v. Cty. of Pike, No. 10-0111, 2010 WL 956405, at *2 (M.D. Pa. Mar. 11, 2010).  Further, Pennsylvania courts recognize reputation as a fundamental right under the Pennsylvania Constitution.  See Hatchard v. Westinghouse Broad. Co., 516 Pa. 184, 193 (1987).  Accordingly, the Court will dismiss Count XVII only insofar as it purports to seek monetary damages.  The portion of the claim in Count XVII seeking injunctive relief, however, will survive Defendants' Motion to Dismiss.

**B.     Plaintiff's Claims Against Individual Defendants**

Similar to his claims against the Township, Plaintiff also raises claims against the Individual Defendants for: (1) violations of his constitutional rights under Section 1983, and (2) violations of his rights under Pennsylvania state law.  The Court will address Plaintiff's federal claims first, which requires a determination of whether the Individual Defendants are entitled to qualified immunity.

**1.     Section 1983 Claims Against Individual Defendants: Qualified Immunity**

**a.     Qualified Immunity: Violations of Plaintiff's Constitutional Rights**

"Qualified immunity shields officials from civil liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Dennis v. City of Philadelphia, No. 19-2390, 2021 WL 5458432, at *4 (3d Cir. Nov. 23, 2021) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Thus, "[w]hen properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'"  Spady v. Bethlehem Area School Dist., 800 F.3d 633, 637 (3rd. Cir. 2015) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011)).  Qualified immunity has a two-prong test:

> [W]hen analyzing a qualified immunity claim, we consider "(1) whether the plaintiff sufficiently alleged the violation of a constitutional right, and (2) whether the right is 'clearly established' at the time of the official's conduct."

Dennis, 2021 WL 5458432, at *4 (citing L.R. v. Sch. Dist. of Philadelphia, 836 F.3d 235, 241 (3d Cir. 2016)).  "Courts may begin their consideration with either prong."  Spady, 800 F.3d at 637 (citing Pearson v. Callahan, 555 U.S. 223, 236 (2009)).

As noted supra, Plaintiff asserts three separate claims against the Individual Defendants that implicate qualified immunity: (1) violation of Plaintiff's Due Process liberty interest in

employment (Counts V and VI) (Doc. No. 10 ¶¶ 176–91); (2) violation of Plaintiff's Due Process liberty interest in his reputation under the theory of "stigma-plus" (Counts VIII and IX) (Id. ¶¶ 199–212); and (3) violation of Plaintiff's First Amendment right to free speech under the theory of retaliation (Counts XI and XII) (Id. ¶¶ 226–51).  For reasons also discussed supra, Plaintiff has not sufficiently pled violations of his Due Process liberty interests in either employment or reputation, which comprises the first prong of the analysis for qualified immunity.  In short, if there is no constitutional violation, the Individual Defendants are entitled to qualified immunity on Counts V and VI, and Counts VIII and IX.  Therefore, the Court will dismiss these claims against the Individual Defendants (Counts V, VI, VIII, and IX).

But, having found that Plaintiff has sufficiently pled a claim of First Amendment retaliation as applied to the Township, the Court must still determine whether the Amended Complaint plausibly alleges the participation of the Individual Defendants in such conduct, as is required under Section 1983.  "To state a claim against a defendant in his or her individual capacity under Section 1983, a plaintiff must establish that the defendant had personal involvement in committing the alleged violation."  Ewing, 2021 WL 1581186, at *8 (internal citations omitted); see also Downs v. Borough of Jenkintown, 850 F. App'x 158, 159 (3d Cir. 2021) (requiring defendant actively participate in or direct retaliatory action).  "A plaintiff can show the personal involvement of a supervisor through allegations of personal direction or actual knowledge and acquiescence, so long as those allegations are made with particularity."  Ewing, 2021 WL 1581186, at *9 (citing Davenport v. City of Philadelphia, No. 16-6397, 2018 WL 5313021, at *7 (E.D. Pa. Oct. 26, 2018)); see also Downs, 850 F. App'x at 159 n.8 (stating "personal involvement must be demonstrated by outlining 'participation in or actual knowledge of and acquiescence in the wrongful conduct") (citing Chavarriaga v. N.J. Dep't of Corr., 806 F.3d 210, 222 (3d Cir. 2015)

(citation omitted)).  Further, "the mere fact that a named defendant is in a supervisory position is insufficient to establish liability." Ewing, 2021 WL 1581186, at *8–9 (citing Reaves v. Vaugh, No. 00-2786, 2001 WL 936392, at *4 (E.D. Pa. Aug. 10, 2001)) (Section 1983 claim against defendants in their individual capacity dismissed where the plaintiff "relie[d] entirely on Individual Defendants' supervisory positions as the basis for their liability").

Here, the Amended Complaint adequately alleges the personal involvement of the Individual Defendants to support the claim for First Amendment retaliation as required under Section 1983.  Plaintiff does not rely merely on the Individual Defendants' supervisory positions as the basis for liability.  Instead, he alleges in the Amended Complaint with particularity that the Individual Defendants were personally involved in the retaliation Plaintiff claims he was subjected to.  Specifically, Plaintiff alleges that Defendant McKeon engaged in a pattern of harassment following Plaintiff's report of time theft and that Defendant Gwynn knew that McKeon was harassing Plaintiff.  (See Doc. No. 10 ¶¶ 12–14, 16, 36–37, 39–40.)  Further, Plaintiff alleges that both Defendants McKeon and Gwynn knew that the charges underlying Plaintiff's termination proceedings were false, but they nevertheless continued with the proceedings against him.  (See id. ¶¶ 36, 39, 41–42.)  Plaintiff also alleges that the Individual Defendants participated in the decision to submit Plaintiff's name for the Brady referral.  (See id. ¶¶ 39, 44, 51, 54.)

Based on the foregoing, Plaintiff has sufficiently alleged the participation of the Individual Defendants in the First Amendment retaliation claim.

### b.    Qualified Immunity: Whether Right Was Clearly Established

Whether the Individual Defendants are entitled to qualified immunity for the retaliation is a separate question to be answered.  Because a constitutional violation has been properly alleged, it must be determined whether the constitutional right was "clearly established."

51

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001). It is not necessary that there be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." al-Kidd, 563 U.S. at 741. Before a court determines whether a constitutional right was clearly established, it "must first frame the precise contours of that right." Spady, 800 F.3d at 638. In doing so, a court is "not to define clearly established law at a high level of generality." Id. at 638 (citing al-Kidd, 563 U.S. at 742). The court instead "must define the right allegedly violated at the appropriate level of specificity." Id. at 638 (citing Sharp v. Johnson, 669 F.3d 144, 159 (3d Cir. 2012)).

For this reason, the Court will begin by "fram[ing] the precise contours of [the] right" Plaintiff claims was violated. Id. In their Motion, Defendants argue "there was no clearly established First . . . Amendment right[] regarding speech of public employees in the workplace or concerning the obligations of Police Departments, Chiefs of Police or any municipal entities in communicating credibility concerns of police officer witnesses to the District Attorney's Office." (Doc. No. 12-1 at 32). In his Response, Plaintiff counters that "[i]t was clearly established by February 2019 that an employer could not retaliate against the employee for exercise of free speech" and that "some Constitutional violations are so obvious that they provide government defendants with fair warning that the Constitution is violated." (Doc. No. 14-2 at 22) (citing Hope v. Pelzer, 536 U.S. 730, 741 (2002); Nazir v. County of Los Angeles, No. 10-06546 SVW AGRX, 2011 WL 819081, at *10 (C.D. Cal. March 2011)).

The Court agrees with Plaintiff's characterization of the right allegedly violated. Contrary to Defendants' position, there is sufficient precedent in the Third Circuit demonstrating that public

employees possess First Amendment protections against employers when speaking as a private citizen and addressing matters of public concern.  See, e.g., Falco, 767 F. App'x at 300–02; Hill, 455 F.3d at 241–42; see also Garcetti, 547 U.S. at 419.  Indeed, the cases show that this right is clearly established.

In Starnes v. Butler Cty. Court of Common Pleas, 50th Judicial Dist., the Third Circuit affirmed the District Court's finding that qualified immunity did not shield the President Judge of the Butler County Court of Common Pleas from a First Amendment retaliation claim.  See 971 F.3d 416, 429–30 (3d Cir. 2020).  In Starnes, the Court held that "[t]he law is clearly established that [the Judge] may not retaliate against Starnes for exercising her First Amendment rights." Id. at 429 (citing Wilkie v. Robbins, 551 U.S. 537, 555 (2007)).  The Court reasoned that "[o]fficial retaliation for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right.'"  Id. (citing Hartman v. Moore, 547 U.S. 250, 256 (2006) (alteration in original)).

Similarly, in Dougherty, the Third Circuit affirmed the District Court's grant of summary judgment finding that the appellants were not entitled to qualified immunity from a former public school employee's First Amendment retaliation claim.  See 772 F.3d at 986–94.  There, the Court stated:

> Viewing the facts the District Court identified in the light most favorable to Dougherty, we find that the illegality of the Appellants' actions was sufficiently clear in the situation they confronted.  Since at least 1967, it has been settled that a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression . . . In the case at bar, Dougherty's particular type of speech—made as a concerned citizen, purporting to expose the malfeasance of a government official with whom he has no close working relationship—is exactly the type of speech deserving protection under the Pickering and Garcetti rules of decision and our subsequent case law . . . Thus, Appellants had fair notice that their retaliation against Dougherty's constitutionally protected speech would not be shielded by qualified immunity.

Id. at 993 (internal citations and quotations omitted).

Additionally, in McGreevy, the Third Circuit similarly held that school officials were not entitled to qualified immunity from a school nurse's First Amendment retaliation claim. See 413 F.3d at 364–67. There, the Court held that "the illegality of the officials' actions was 'sufficiently clear that they can fairly be said to have been on notice of the impropriety of their actions.'" Id. at 366–67 (citing Kinney v. Weaver, 367 F.3d 337, 372 (5th Cir. 2004)). The Court further noted that "[the Third Circuit's] cases make plain that the law [prohibiting a public employer from retaliating against an employee for engaging in protected speech] is clearly established." Id. at 367 (internal citations omitted).

Based on this precedent, it is evident that the right of a public employee to address matters of public concern—in this case, the misuse of public funds by a municipal police department—without fear of retaliation from his employer is established "beyond debate." al-Kidd, 563 U.S. at 741. Therefore, under the facts alleged in the Amended Complaint, which the Court must accept as true at this stage, it would be "clear to a reasonable [official] that [Defendants'] conduct was unlawful." Saucier, 533 U.S. at 202; see also Dougherty, 772 F.3d at 993. If, as is alleged here, the Individual Defendants retaliated against Plaintiff because he reported the Sergeant's false submission of time, and the retaliation included pursuing termination proceedings against Plaintiff and basing a Brady referral on information they knew to be false, it is not reasonable for them to claim that they were unaware that their conduct was unlawful because it was not clearly established. (See Doc. No. 10 ¶¶ 7–8, 12–13, 52–54.)

Thus, the Individual Defendants are not entitled to qualified immunity with respect to Counts XI and XII. These claims will survive Defendants' Motion to Dismiss.

### 2.      State Law Claims Against Individual Defendants

The Court will next consider Plaintiff's remaining claims the against the Individual Defendants under Pennsylvania state law.  In the Amended Complaint, Plaintiff asserts state law claims against the Individual Defendants for: (1) violation of the Pennsylvania Whistleblower law (Counts II and III) (see id. ¶¶ 146–67); (2) defamation (Counts XIII and XIV) (see id. ¶¶ 252–83); and (3) false light defamation (Counts XV and XVI) (see id. ¶¶ 284–305.).  Like the Township, the Individual Defendants argue that these claims should be dismissed on the merits and because they are entitled to immunity under state law.  (See Doc. No. 12 at 22–25, 33–34.)  The Court begins with the Individual Defendants' claim of immunity.

### a.      Immunity Under the Political Subdivision Tort Claims Act

The PSTCA shields the Individual Defendants from liability for "acts . . . which are within the scope of [the Individual Defendants'] office or duties," unless the acts of the Individual Defendants "constituted a crime, actual fraud, actual malice or willful misconduct."  42 PA. CONS. STAT. § 8545, § 8550; see also Sanford v. Stiles, 456 F.3d 298, 315 (3d Cir. 2006) ("Employees are not immune from liability under § 8545 where their conduct amounts to 'actual malice' or 'willful misconduct.'").

Defendants argue here that the Individual Defendants did not act with actual malice or willful misconduct in the alleged retaliation toward Plaintiff by seeking his termination or by submitting his name for placement on the Brady List.  (See Doc. No. 12-1 at 34.)  Defendants also argue that the Individual Defendants are entitled to "official immunity for claims brought under Pennsylvania law for any acts performed within the scope of their employment and for which they reasonably believe that their conduct was authorized or required by law and they did not act maliciously or recklessly."  (Id. at 33–34) (citing 42 PA. CONS. STAT. §§ 8545–46; Dorsey v. Redman, 22 A.3d 374, 381–82 (Pa. Commw. Ct. 2011)).

"Willful misconduct has been defined by the Pennsylvania Supreme Court as 'conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied.'"   Sanford, 456 F.3d at 315 (citing Renk v. City of Pittsburgh, 537 Pa. 68, 75 (1994)).   Further, "willful misconduct is a demanding level of fault."   Id.

Here, the Amended Complaint sufficiently alleges that the Individual Defendants' conduct rises to the level of willful misconduct.  If, as is alleged here, the Individual Defendants submitted Plaintiff's name to the Brady List based on information they knew to be false (see Doc. No. 10 ¶¶ 8, 51–54), it can be implied that the Individual Defendants desired the Brady referral to be used against Plaintiff in his campaign for Magisterial District Judge and to derail his career as a police officer.  It can also be inferred that the Individual Defendants engaged in a pattern of filing complaints against Plaintiff because they wanted him to leave the Department.  These acts were committed in retaliation for his report of misconduct.  Therefore, the Individual Defendants are not immune from Plaintiff's state law claims.

### b.       Pennsylvania Whistleblower Law

For the same reasons why Plaintiff's Whistleblower claims against the Township are being dismissed, the Court also will dismiss Plaintiff's claims against the Individual Defendants for violating the same statute (Counts II and III).

### c.       Defamation

In Counts XIII and XIV of the Amended Complaint, Plaintiff asserts claims for defamation against the Individual Defendants.  (See Doc. No. 10 ¶¶ 252–83).  The elements of defamation under Pennsylvania law are as follows:

In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:

(1) The defamatory character of the communication.

(2) Its publication by the defendant.

(3) Its application to the plaintiff.

(4) The understanding by the recipient of its defamatory meaning.

(5) The understanding by the recipient of it as intended to be applied to the plaintiff.

(6) Special harm resulting to the plaintiff from its publication.

(7) Abuse of a conditionally privileged occasion.

42 PA. CONS. STAT. § 8343(a).

Plaintiff's claims for defamation appear to stem from the Individual Defendants' referral of him to the MCDAO for inclusion on its Brady List which Plaintiff alleges was based on false information.  (See Doc. No. 10 ¶¶ 8, 51–54.)  Defendants argue that Plaintiff cannot establish a prima facie defamation claim against the Individual Defendants because the statements leading to Plaintiff's inclusion on the Brady List were "neither false nor capable of defamatory meaning." (Doc. No. 12-1 at 26).  Defendants further argue that they were "obligated to report any credibility concerns involving Plaintiff as a police witness to the District Attorney's Office."  (Id. at 28).

As the Court has already noted, it is not the appropriate at this stage for it to make determinations with respect to the veracity of the statements in the Brady referral.  However, as this Court held in Mzamane v. Winfrey:

> [W]hether the statements at issue are capable of defamatory meaning is a question of law to be decided by the Court . . . .  In making this legal determination, the Court must view the statement in the factual context in which it was made . . . .  The touchstone in determining whether a statement is capable of defamatory meaning is how the statement would be interpreted by the average person to whom it was directed.

693 F. Supp. 2d 442, 479 (E.D. Pa. 2010).

Defendants argue that "[s]tatements critical of an employee's job performance are generally not capable of defamatory meaning." (Doc. No. 12-1 at 27) (citing <u>Burch v. WDAS AM/FM</u>, No. 00-4852, 2002 WL 1471703, at *12 n.15 (E.D. Pa. June 28, 2002).  As discussed <u>supra</u>, Defendants' characterization of the accusations Plaintiff alleges they relied on in submitting Plaintiff for inclusion on the <u>Brady</u> List do not comport with the allegations in the Amended Complaint, where they are described as entirely false.  And these accusations do not merely concern Plaintiff's performance in his job as a police officer, but go directly to his integrity and reputation.  As noted in <u>Krajewski v. Gusoff</u>:

> A communication is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.  A communication is also defamatory if it ascribes to another conduct, character or a condition that would adversely affect his fitness for the proper conduct of his proper business, trade or profession. . . .  [I]f there is an innocent interpretation and an alternate defamatory interpretation, the issue must proceed to the jury

53 A.3d 793, 802–03 (Pa. Super. Ct. 2012) (quoting <u>Maier v. Maretti</u>, 671 A.2d 701, 704 (Pa. Super. Ct. 1995)).

Here, the statements that served as the basis for his <u>Brady</u> referral—namely, fabricated charges that Plaintiff lied in his capacity as a police officer—are capable of defamatory meaning. These statements would lower Plaintiff in the estimation of his community, deter others from dealing with him, and adversely affect Plaintiff's fitness to serve in his profession of law enforcement.  Further, the average person in Plaintiff's position would interpret these statements as defamatory based on the allegations set forth in the Amended Complaint.

Regarding the second element of defamation, the Court has already found, <u>supra</u>, that Defendants caused the statements concerning Plaintiff's dishonesty as a police officer to be publicized when they, or individuals acting on their behalf, disclosed the information to Plaintiff's

political adversary.  (See Doc. No. 10 ¶ 71.)  Next, Plaintiff sufficiently alleges the application of these statements to him, as they specifically refer to him personally.  Regarding the fourth and fifth elements, Plaintiff sufficiently alleges the understanding by the recipient of the statements of their defamatory meaning and that they were intended to be applied to harm Plaintiff in his campaign for Managerial District Judge.  (See id. at ¶¶ 68–72, 81–88, 92.)

Plaintiff's defamation claim also must meet the sixth element.  "'[A] plaintiff must plead a specific monetary or out-of-pocket loss as a result of the defamation' to satisfy the 'special harm' requirement of the statute."  NTP Marble, Inc. v. AAA Hellenic Marble, Inc., 799 F. Supp. 2d 446, 452 (E.D. Pa. 2011) (citing Cornell Companies, Inc. v. Borough of New Morgan, 512 F. Supp. 2d 238, 271 (E.D. Pa. 2007)).  Here, Plaintiff alleges that he suffered harm due to the statements of the Individual Defendants, albeit in a general and conclusory manner.  Plaintiff alleges that, due to the alleged defamation, he suffered "inability to continue to perform his profession as a law enforcement officer or as an elected official in light of the stigma of being subject to the 'Brady Procedure' designation."  (Doc. No. 10 at ¶¶ 267, 282.)

This is not enough to meet the requirements that special damages be "actual and concrete damages capable of being estimated in money, established by specific instances such as actual loss due to withdrawal of trade of particular customers, or actual loss due to refusal of credit by specific persons, all expressed in figures."  Beverly Enterprises, Inc. v. Trump, 182 F.3d 183, 188 (3d Cir. 1999) (citing Altoona Clay Products, Inc. v. Dun & Bradstreet, Inc., 246 F. Supp. 419, 422 (W.D. Pa. 1965), rev'd and remanded on other grounds, 367 F.2d 625 (3d Cir. 1966)) (internal quotations omitted).  Further, "[t]hese are requirements of pleading as well as proof."  Altoona, 246 F. Supp. at 422.  Accordingly, Plaintiff has not pled the requisite specificity needed to show he suffered special harm resulting from the defamatory statements.

But Plaintiff need not satisfy the requirement to plead special harm when the statements underlying the defamation allegation constitutes defamation per se.  See NTP Marble, Inc., 799 F. Supp. 2d at 452.  In this situation, a plaintiff need only prove "general damages, i.e., proof that one's reputation was actually affected by defamation or that one suffered personal humiliation, or both."  Joseph v. Scranton Times L.P., 959 A.2d 322, 344 (Pa. Super. Ct. 2008).  To constitute defamation per se, the words spoken by the alleged defamer must impute: "(1) criminal offense, (2) loathsome disease, (3) business misconduct, or (4) serious sexual misconduct."  Clemente v. Espinosa, 749 F. Supp. 672, 677 (E.D. Pa. 1990) (citing Restatement (Second) of Torts § 570 (1977)).

Here, although the Amended Complaint does not title the defamation claim as defamation per se, the facts set forth give rise to such a claim and make such an analysis appropriate. Particularly, the Amended Complaint may plausibly be read to allege that the Brady List referral imputed that Plaintiff either committed a criminal offense or engaged in business misconduct, or both.  Arguably, Plaintiff could establish that the Brady referral implied that he had committed perjury when testifying in criminal matters in his capacity as a police officer.  Plaintiff's stronger claim, however, is that the Brady referral imputed that he had engaged in business misconduct:

> One who publishes a slander that ascribes to another conduct, characteristics or a condition that would adversely affect his fitness for the proper conduct of his lawful business, trade or profession, or of his public or private office, [. . .] is  subject to liability without proof of special harm.

Clemente, 749 F. Supp. at 677–78 (citing Restatement (Second) of Torts § 573 (1977)) (alteration in original).

In Clemente, a court concluded that a plaintiff had properly alleged a claim of defamation per se based on a business misconduct theory where the defendant accused the plaintiff, an attorney, of being "connected with the Mafia."  Id. at 677.  There, the court noted that "[t]he career

of an attorney is closely linked with his reputation for honesty and integrity" and that the allegations "impute[d] both a disregard for the law he is charged to uphold, and a character inconsistent with that required of a member of the legal profession." Id. at 678. Similarly here, the career of a police officer is also linked with one's reputation for honesty and integrity. Further, the conduct underlying the Brady referral imputes a disregard for the law that Plaintiff was charged to uphold. Indeed, as Plaintiff alleges in the Amended Complaint, this type of conduct very well could mark "the end of [Plaintiff's police officer] career and make[] him unemployable in law enforcement." (Doc. No. 10 at ¶ 52.) Accordingly, the Amended Complaint sufficiently alleges a claim for defamation per se. As such, Plaintiff need only allege that he suffered general damages. The Amended Complaint does so here.

Finally, the Court turns to the last element of Plaintiff's defamation claim against the Individual Defendants: the abuse of a conditionally privileged occasion. Defendants argue that the statements made to the MCDAO were protected by a conditional privilege because they were obligated to report any credibility concerns regarding police officers. (See Doc No. 12-1 at 28.).

> A conditional privilege attaches to communications made on a proper occasion, from a proper motive, and in a proper manner . . . whenever circumstances are such as to lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that facts exist which another sharing such common interest is entitled to know.

Tucker v. Merck & Co., Inc., 102 F. App'x 247, 253–54 (3d Cir. 2004).

While it is true that Defendants are obligated to report any credibility concerns involving police witnesses to the District Attorney's Office, that is not what is alleged here. In the Amended Complaint, Plaintiff alleges that Defendants referred Plaintiff for placement on the Brady List based on accusations Defendants knew to be false and that Defendants did so for "partisan purposes." (Doc. No. 10 ¶¶ 8, 54, 63.) No authority imposes on Defendants a duty or obligation

to fabricate accusations that cause a police officer to be placed on the District Attorney's <u>Brady</u> List, as Plaintiff alleges occurred here when viewing his allegations in the Amended Complaint in the light most favorable to him.  Further, the privilege Defendants rely on is

> abused . . . and thus the defense is rendered inapplicable, when publication (1) is actuated by malice or negligence; (2) is made for a purpose other than that for which the privilege is given; (3) is made to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege; or (4) includes defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose.

<u>Tucker</u>, 102 F. App'x at 254.

The Amended Complaint contains sufficient allegations that the Individual Defendants acted with actual malice by submitting Plaintiff's name for inclusion on the <u>Brady</u> List based on false grounds.  Therefore, at this stage, Defendants' argument that they were obligated to submit Plaintiff's name to the <u>Brady</u> List is unavailing and Plaintiff has pled the abuse of their conditional privilege.

Because the Amended Complaint contains sufficient allegations to plausibly state a claim of defamation <u>per se</u> against the Individual Defendants, the Motion to Dismiss will be denied with respect to Counts XIII and XIV.

### d.    False Light Defamation

In Counts XV and XVI, Plaintiff alleges claims of false light defamation against the Individual Defendants.  (<u>See</u> Doc. No. 10 ¶¶ 284–305.)  Pennsylvania law imposes liability for a claim of false light defamation "on a person who publishes material that is not true, is highly offensive to a reasonable person, and is publicized with knowledge or in reckless disregard of its falsity."  <u>Graboff v. Colleran Firm</u>, 744 F.3d 128, 136 (3d Cir. 2014) (internal quotations and citations omitted); <u>see also</u> <u>Rush v. Phila. Newspapers, Inc.</u>, 732 A.2d 648, 654 (Pa. Super. Ct. 1999).

Here, the Amended Complaint sufficiently pleads a cause of action for false light defamation. Plaintiff alleges that the accusations underlying the <u>Brady</u> referral were not true and fabricated by Defendants as a result of their personal vendetta against Plaintiff. (<u>See</u> Doc. No. 10 ¶¶ 8, 51–54.) And a reasonable person in Plaintiff's position would find submission of his name on a <u>Brady</u> List for false reasons to be highly offensive. Additionally, as discussed <u>supra</u>, the Court has already determined that Plaintiff plausibly alleges that the Individual Defendants caused this information to be publicized as part of the campaign against Plaintiff in the election for Magisterial District Judge. Finally, Plaintiff sufficiently alleges that Defendants publicized this information "with knowledge or in reckless disregard of its falsity." <u>Graboff</u>, 744 F.3d at 136. As such, Defendants' Motion to Dismiss Counts XV and XVI will be denied.

### C.     Punitive Damages

Lastly, the Court will address Plaintiff's claims for punitive damages against both the Township and the Individual Defendants. For each of the seventeen counts set forth in the Amended Complaint, Plaintiff claims that he is entitled to punitive damages. (<u>See</u> Doc. No. 10 at 22–46.) Defendants assert that Plaintiff's claims for punitive damages must be dismissed as a matter of law because punitive damages are not recoverable against municipalities or individual defendants who are acting in their official capacity. (<u>See</u> Doc. No. 12-1 at 35–36.)

In his Response, Plaintiff concedes that parties may not recover punitive damages under Section 1983 against municipalities or officials acting within the scope of their authority. (<u>See</u> Doc. No. 14-2 at 25.) However, Plaintiff counters that courts may impose punitive damages on officials acting in their personal, rather than official, capacity. (<u>See</u> <u>id.</u> at 26.) Plaintiff further asserts that decisions in this District do not adequately consider the full import of <u>Smith v. Wade</u>, which held that punitive damages may be assessed "in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous

indifference to the federally protected rights of others." 461 U.S. 30, 56 (1983). Plaintiff urges this Court to join the Seventh Circuit in permitting Plaintiff to recover punitive damages against officials who acted recklessly in their official capacity. (See Doc. No. 14-2 at 26); see also Kolar v. Sangamon County of State of Ill., 756 F.2d 564, 569 n.7 (7th Cir. 1985).

Here, there is no dispute between the parties regarding the issue of punitive damages against the Township. Plaintiff correctly concedes that he cannot recover punitive damages against a municipality under a Section 1983 claim. (See Doc. No. 14-2 at 25); see also City of Newport v. Fact Concerts, 453 U.S. 247 (1981); Smith v. Dunmore, 633 F.3d 176 (3d Cir. 2011). Therefore, the Court will dismiss Plaintiff's claim for punitive damages against the Township.

However, punitive damages may be available against Defendants McKeon and Gwynn if they were acting in their individual, rather than official, capacity. Numerous courts within the Third Circuit have emphasized the importance of this distinction for the availability of punitive damages. See, e.g., Meadows v. Southeastern Pennsylvania Transportation Authority, No. 16-2074, 2016 WL 6495127 (E.D. Pa. Nov. 2, 2016) (finding that plaintiff could recover punitive damages when suing defendant employees of government agencies in their individual capacity); Strickland v. Mahoning Township, 647 F. Supp. 2d 422 (M.D. Pa. 2009) (finding that plaintiff could recover punitive damages against municipality employees acting in their individual capacity).

Here, Plaintiff alleges sufficient facts showing that Defendants McKeon and Gwynn acted "intentionally, willfully and wantonly, maliciously, and with the intent to harm Plaintiff," satisfying the standard for punitive damages. (Doc. No. 12-1 at 10.) Therefore, the Court will not grant Defendants' Motion to Dismiss the punitive damage claim against Defendants McKeon and

Gwynn.  Discovery, however, may allow the Court to determine whether the facts show that Defendants were acting in their official or individual capacity at the time of their actions.

## V. CONCLUSION

For all the foregoing reasons, Defendants' Motion to Dismiss (Doc. No. 12) will be granted in part and denied in part as follows:

**GRANTED:**

- Count I:     Plaintiff v. Defendant New Hanover Township for Violation of Pennsylvania's Whistleblower Law, 43 PA. CONS. STAT. § 1421, et seq.;

- Count II:    Plaintiff v. Defendant Kevin McKeon for Violation of Pennsylvania's Whistleblower Law, 43 PA. CONS. STAT. § 1421, et seq.;

- Count III:   Plaintiff v. Defendant Jamie Gwynn for Violation of Pennsylvania's Whistleblower Law, 43 PA. CONS. STAT. § 1421, et seq.;

- Count IV:    Plaintiff v. Defendant New Hanover Township for Deprivation of Plaintiff's Liberty Interest in Employment, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, U.S. CONST. amend. XIV;

- Count V:     Plaintiff v. Defendant Kevin McKeon for Deprivation of Plaintiff's Liberty Interest in Employment, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, U.S. CONST. amend. XIV;

- Count VI:    Plaintiff v. Defendant Jamie Gwynn for Deprivation of Plaintiff's Liberty Interest in Employment, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, U.S. CONST. amend. XIV;

- Count VII:   Plaintiff v. Defendant New Hanover Township for Deprivation of Plaintiff's Liberty Interest in Reputation and Continued Employment in the Law Enforcement Field, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, U.S. CONST. amend. XIV ("Stigma Plus Cause of Action");

- Count VIII:  Plaintiff v. Defendant Kevin McKeon for Deprivation of Plaintiff's Liberty Interest in Reputation and Continued Employment in the Law Enforcement

Field, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, U.S. CONST. amend. XIV ("Stigma Plus Cause of Action");

- Count IX:        Plaintiff v. Defendant Jamie Gwynn for Deprivation of Plaintiff's Liberty Interest in Reputation and Continued Employment in the Law Enforcement Field, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, U.S. CONST. amend. XIV ("Stigma Plus Cause of Action");

- Count XVII:      Plaintiff v. Defendant New Hanover Township for Deprivation of Plaintiff's Liberty Interest in Reputation and Continued Employment in the Law Enforcement Field, in violation of Article I of the Pennsylvania Constitution, PA. CONST. art. 1, §§ 1, 11, only insofar as it seeks monetary damages.

**DENIED:**

- Count X:         Plaintiff v. Defendant New Hanover Township for Retaliating against Plaintiff for asserting his rights under the First Amendment to the United States Constitution, U.S. CONST. amend. I;

- Count XI:        Plaintiff v. Defendant Kevin McKeon for Retaliating against Plaintiff for asserting his rights under First Amendment to the United States Constitution, U.S. CONST. amend. I;

- Count XII:       Plaintiff v. Defendant Jamie Gwynn for Retaliating against Plaintiff for asserting his rights under the First Amendment to the United States Constitution, U.S. CONST. amend. I;

- Count XIII:      Plaintiff v. Defendant Kevin McKeon for Defamation, in violation of Pennsylvania Law;

- Count XIV:       Plaintiff v. Defendant Jamie Gwynn for Defamation, in violation of Pennsylvania Law;

- Count XV:        Plaintiff v. Defendant Kevin McKeon for False Light Defamation, in violation of Pennsylvania Law;

- Count XVI:       Plaintiff v. Defendant Jamie Gwynn for False Light Defamation, in violation of Pennsylvania Law;

- Count XVII:      Plaintiff v. Defendant New Hanover Township for Deprivation of Plaintiff's Liberty Interest in Reputation and Continued Employment in the Law Enforcement Field, in violation of Article I of the Pennsylvania

Constitution, Pa. Const. art. 1, §§ 1, 11, only insofar as it seeks equitable relief.

An appropriate Order follows.